**COALITION OF MICHIGAN NURSING HOMES, INC., Four Chaplins Convalescent Center, Inc., Cadillac Nursing Home, Inc., Clintonview Care, Inc., Northwest Care Center, Inc., and That Class Consisting of All Nursing Homes Similarly Situated, Plaintiffs,**

v.

**Dr. John DEMPSEY, Director, Department of Social Services, or his Successor, State of Michigan, and Department of Social Services, State of Michigan and Richard Schweiker, Secretary, Department of Health and Human Services, or his Successor, and Department of Health and Human Services, Defendants.**

Civ. A. Nos. 81–70786, 78–71984.

United States District Court,
E. D. Michigan, S. D.

March 1, 1982.

Gasper J. Gammicchia, Harper Woods, Mich., John A. Cook, Alexander J. Lelli, Jr., Birmingham, Mich., for plaintiffs.

Robert N. Rosenberg, Asst. Atty Gen., Lansing, Mich., Ellen G. Ritteman, Asst. U. S. Atty., Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

PHILIP PRATT, District Judge.

### I. INTRODUCTION

Jurisdiction for plaintiffs' Motion for Preliminary Injunction is based on a federal question arising from Title XIX of the Social Security Act of 1935, as added July 30, 1965, popularly known as Medicaid. Plaintiffs are Coalition of Nursing Homes, a non-profit association of Long Term Care Facilities (LTCF) in Michigan and four individual LTCFs named in the caption. LTCFs care for the elderly and chronically ill, and are reimbursed for services rendered to Medicaid-eligible residents with state money and matching federal funds under the Grants to States for Medical Assistance Programs. Title XIX, § 1901 *et seq.* Social Security Act of 1935, codified at 42 U.S.C.A. § 1396 *et seq.*

Plaintiffs seek to enjoin the state defendant, John Dempsey, Director of Michigan Department of Social Services (DSS) from continued implementation of an amendment to Michigan's State Plan for Medicaid Participation,[1] which has reduced the maximum profit factor paid to some proprietary (for profit) LTCFs by fifty cents per medicaid patient per day. Plaintiffs also seek to enjoin federal defendant, Richard Schweiker, Secretary of Health and Human Services (HHS) from approving the State Plan amendment which authorized the reimbursement reduction. For the reasons given below, plaintiffs' Motion for Preliminary Injunction is denied.

---

1. To participate in this optional federal funding program a state must submit a State Plan for Medical Assistance to HHS for its approval before the state is eligible to receive any matching federal funds. 42 U.S.C.A. § 1396. The state plan must meet various conditions as set forth in 42 U.S.C.A. § 1396a(a) 1–41; if the plan does conform the Secretary of HHS must, with certain exceptions, approve the plan. 42 U.S.C.A. § 1396a(b).

## II. STATE LEGISLATURE AND DSS BACKGROUND

The State Plan provides for payment to proprietary LTCFs based on a calculation of actual allowable costs [2] for both (1) routine services and other non-plant allowable costs known as the variable cost component, and (2) actual plant costs, which comprise the plant cost component. Both cost components are calculated on a patient per day basis (PPD).

Participating LTCFs are reimbursed their actual allowable costs up to the variable cost limit. That limit, set at the 80th percentile of variable costs for all providers in that LTCF's class,[3] represents the state's determination that homes whose allowable costs are in the top 20% of its class are not "economically and efficiently operated." [4]

Those whose actual allowable costs fall below the 80th percentile are reimbursed in full for their "actual allowable costs," [5] and allowed to keep a portion of the differential between their actual costs and the cost limit. Prior to January 1, 1982 the maximum differential on variable costs the providers could retain was $1.00 PPD.

LTCFs are also reimbursed their actual allowable plant costs up to the plant cost limit which is set at the 80th percentile among all Medicaid providers in Michigan without reference to class. Providers whose actual allowable plant costs are below the limit were allowed to keep up to $.50 PPD prior to January 1, 1982. The State Plan labels these differentials between actual variable and plant cost components and the variable and plant cost limits as a "profit factor".[6] Thus, the maximum "profit factor" an LTCF could retain under the State Plan was $1.50 PPD prior to January 1, 1982.

The State of Michigan is currently suffering a severe budget crisis due to the general economic downturn. Because Michigan's Constitution prohibits deficit spending,[7] and state revenues were likely to fall short of amounts appropriated, Governor Milliken ordered numerous expenditure reductions to be retroactively effective October 1, 1981.[8] Out of an overall reduction of $270,-

---

**2.** Some items of allowable costs were formerly specified by federal regulations. 42 C.F.R. §§ 447.278—447.284. These regulations were removed September 30, 1981, 46 F.R. 47971. Allowable costs, as detailed in the Michigan State Plan, § III, include costs for routine services; e.g., room, board, nursing care and durable medical equipment for multiple patient use; costs for compliance with government regulations and standards, and owner/administrator's salaries.

**3.** Under the Michigan State Plan, there are four classes of LTCFs.
  1). County Medical Care Facilities and hospital Long Term Care Units.
  2). Proprietary and Non Profit Nursing homes.
  3). Nursing facilities for the mentally ill and mentally retarded.
  4). Intermediate care facility/mentally retarded.
  This litigation involves LTCFs in the second category.

**4.** See discussion of this new federal standard of reimbursement *infra* at pages 454–457.

**5.** "The actual allowable costs" are calculations by DSS which in many instances do not represent the current actual costs because the costs were set relative to 1976 reimbursement ceilings and have not been updated on a regular basis. Thus reimbursement in full of "actual allowable costs" on paper does not indicate that an LTCF's *real* costs are actually being reimbursed. Plaintiffs' accountant testified that proprietary LTCFs require a certain percentage of private patients who pay in full for costs actually incurred in order to avoid operating at a loss.

**6.** In light of the fact that some providers do rely on this "profit factor" to compensate for less than adequate reimbursement of actual allowable costs, it would be more accurate to denominate the retained portion of the differential an "incentive factor" rather than a "profit factor." *See* Supplemental Statement of Basis and Purpose of Regulations, 43 F.R. 4863 (Feb. 6, 1978).

**7.** The Michigan Constitution provides in pertinent part that "[p]roposed expenditures from any fund shall not exceed the estimated revenue thereof." M.C.L.A. Constitution, Art. 5, § 18 (1963).

**8.** Executive Order 1981-9, signed October 22, 1981, Ex. K. The Governor, in accordance with the Constitution had obtained the approval of a majority of members of the House and Senate appropriating committees before entry of the order.

000,000, DDS experienced expenditure cuts of $152,000,000 for programs under its jurisdiction, e.g., Aid to Families with Dependent Children, General Assistance, Day Care, Foster Care, etc. The reduction involved here totals $3,100,000.

This latter total reduction was implemented by the specified reduction of the maximum "profit factor" to be paid to both Skilled Nursing Facilities (SNF) and Intermediate Care Facilities (ICF) from a total of $1.50 PPD to $1.00 PPD maximum. It is this reduction that plaintiffs seek to enjoin.

DSS gave due notice of the intended reduction which would take effect January 1, 1982 to the public on November 1, 1981 as required by Federal regulations, 42 C.F.R. 447.254 (effective Oct. 1, 1981), and to the impacted providers on November 23, 1981 as required by Michigan law. M.C.L.A. § 400.111a(4). The Medical Care Advisory Council (MCAC), discussed *infra*, was notified of the proposed reduction at a regular meeting November 10, 1981. The amendment to the state plan which would implement the reduction was forwarded to HHS with the requested assurances and related information, 42 C.F.R. 447.255, on December 4, 1981 for the Secretary's approval, which DSS received December 23, 1981.

### III. THE STANDARDS FOR PRELIMINARY INJUNCTION

Plaintiffs claim that various state and federal procedural and substantive irregularities in the enactment, approval, and implementation of the $.50 PPD profit factor reduction, entitle plaintiffs to preliminary injunctive relief. Plaintiffs' motion must be tested against the four prerequisites used in this Circuit, as set forth in *Mason County Medical Ass'n. v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977).

"1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction."

In the Court's opinion, plaintiffs have failed to establish even one of the elements, let alone all four as required. Each element will be addressed seriatim.

#### A. *Likelihood of Success on the Merits*

Plaintiffs have challenged the state's action in both the decision to reduce the profit factor and its implementation as an amendment to the state plan, on the grounds that the MCAC was not adequately consulted, that the state failed to provide the Secretary of HHS with quantified estimates, *see* 42 C.F.R. 447.255(b)(2) and relied only on budgetary constraints to justify the reduction.

Plaintiffs have also challenged both the adequacy of HHS review of the proposed state plan amendment assurances and related information under the newly promulgated Federal regulations, and the validity of the regulations themselves, because they were promulgated without a 30 day notice and comment period as required by the Administrative Procedure Act, 5 U.S.C. § 553(b).

Although plaintiffs have enumerated specific procedural inadequacies, the gravamen of their complaint is that without the additional fifty cents PPD profit factor, which was eliminated January 1, 1982, the rates of reimbursement to the impacted LTCFs will not be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," as required by Congress.[9] In order to evaluate the merits of plaintiffs' several claims, it is necessary to review the evolution of this federal standard of reimbursement.

---

**9.** Section 1902(a)(13)(A) of the Social Security Act of 1935, as added July 30, 1965, as amended by Public Law 96–499 § 962(a), December 5, 1980, and Public Law 97–35 § 2173, August 13, 1981, currently codified at 42 U.S.C.A. § 1396a(a)(13)(A).

### 1) Federal Legislative and HHS Background

Prior to 1972 Congress had provided no guidance as to how reimbursement rates for LTCFs participating in Medicaid should be set. Some states used a flat rate payment method whereby reimbursement rates were based on the total budget allocation divided by the number of patient days, without any reference to the actual costs incurred.[10]

In 1972 Congress enacted a new standard for reviewing state rate setting methodologies.

"(a) A state plan for medical assistance must . . .

(13) provide . . .

(E) Effective July 1, 1976, for payment of the skilled nursing facility and intermediate care facility services provided under the plan on a *reasonable cost related basis*, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost finding methods approved and verified by the Secretary;"

42 U.S.C.A. § 1396a(a)(13)(E) (1974) (emphasis added).[11]

This addition was motivated by Congress' desire to give guidance to states in setting reimbursement rates which would avoid the then existing problem of flat rates. That type reimbursement methodology had led to overpayment to some facilities, resulting in private profit at public expense, and underpayment to others, providing too little reimbursement to ensure good care for the residents. At the same time, Congress sought to avoid mandating that states follow the cumbersome Medicare reimbursement formula set forth in Title XVIII of the Social Security Act of 1935, which provides for reimbursement of "reasonable costs." 42 C.F.R. § 405.454. The compromise standard of "reasonable cost related basis" was intended to give states the flexibility to experiment with various reimbursement methodologies, including—but not limited to the Medicare method of "retrospective reasonable cost" reimbursement, *see* 41 F.R. 27300 (July 1, 1976), in order to develop acceptable cost finding techniques while eliminating arbitrary flat rate reimbursement plans.

Congress, however, still was not satisfied with the amount of money being expended and the degree of federal oversight required of the states' rate setting methods for LTCFs. *See* 46 F.R. 47966 (Sept. 30, 1981). Congress replaced the "reasonable cost-related" standard for reimbursement with a new standard which merely required that "reimbursement rates must be reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities . . ."[12]

The legislative history underlying this new standard (known as the Boren Amend-

10. *See e.g., Florida Nursing Home Ass'n. v. Page*, 616 F.2d 1355, 1357, n.1 (5th Cir. 1980); *Alabama Nursing Home Ass'n. v. Harris*, 617 F.2d 388, 391, n.4 (5th Cir. 1980).

11. This section was added as a part of the Social Security Amendments of 1972, Public Law 92–603 § 249. *See* (1972) U.S.Code Cong. & Admin.News, 1548, 1667; legislative history *id.*, at 5389–90.

12. The applicable language in pertinent part states:
"(a) A state plan for medical assistance must . . .
(13) provide . . .
(E) for payment . . . of the skilled nursing facility and intermediate care facility services provided under the plan through the use of *rates (determined in accordance with methods and standards developed by the State)* *which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each skilled nursing or intermediate care facility and periodic audits by the State of such reports; . . ."
42 U.S.C.A. 1396a(a)(13)(E) (as amended by The Omnibus Budget Reconciliation Act (OBRA) of 1980, P.L. 96–499 § 962(b), effective Oct. 1, 1980 (enacted Dec. 5, 1980) (Emphasis added).

ment)[13] reflects a desire to eliminate the paper work requirements involved in administering the "reasonable cost-related standard" which required burdensome record keeping by LTCFs to determine actual and allowable costs, supervisory audits by the states, and detailed HHS review of both. *See generally* 42 C.F.R. §§ 447.274—447.296 (removed Sept. 30, 1981, 46 F.R. 47971) and Michigan State Plan Attachment 4.19–D.

The Secretary of HHS responded to the Boren Amendment with interim guidelines[14] and notice that new regulations were being developed.[15] Before final regulations could be promulgated[16] implementing the Boren Amendment, Congress enacted the Omnibus Budget Reconciliation Act (OBRA) of 1981, to be effective October 1, 1981.

Under OBRA 1981, the new "reasonable and adequate" standard of the Boren Amendment was expanded to include hospitals as well as other LTCFs.[17] In addition, Congress required that new implementing regulations, even if in interim form, be in effect prior to the implementation of any budget cuts necessary to meet the 3% reduction of funds paid to states in fiscal 1982, which began October 1, 1981.[18]

Although there was no explicit Congressional mandate that the new regulations be in effect October 1, 1981, the practical result of failure to promulgate them by that date, would be HHS's inability to reduce its fiscal outlay to correspond to its reduced appropriations for 1982, and attendant budget overruns. Between the enactment of OBRA of 1981 on August 13, 1981 and its

effective date, October 1, 1981, HHS had 49 days to promulgate and publish final regulations. HHS published "Interim Final Regulations" as it had been authorized to do by Congress, on September 30, 1981, to be effective immediately, 46 F.R. 47964–73, without prior notice and comment period.

The new regulations, mostly a restatement of the statutory language, required the states to find that payment rates to LTCFs are "reasonable and adequate" and so assure HHS, 42 C.F.R. § 447.252, ensure that the state plan conforms to the new standards, § 447.253, give public notice of significant changes to rate setting methods, § 447.254, and to submit assurances and substantiating related information, § 447.-255. In addition, states must continue to provide for appeals of rate determinations, § 447.258, provider cost reporting, § 447.-260 and audits, § 447.265. The regulations also set upper limits for Medicaid reimbursements relative to both customary charges, § 447.271, and Medicare payments, § 447.272.

### 2) *Plaintiffs' Federal Claims*

Having reviewed the legislative origins of the standard and implementing regulations at issue, the Court is now prepared to address the merits of plaintiffs' claims against the federal defendants.

(a) *Promulgation of Interim Final Regulations Without a Prior Notice and Comment Period Does Not Violate the APA*

The Administrative Procedure Act requires that promulgation of final regulations be preceded by a 30 day notice and

13. *See* Congressional Record for June 26, 1980, S 8257.

14. Under the interim guidelines HHS deemed plans approved prior to October 1, 1980 to conform with the new standard, continued applying the old standard and regulations to state plans then under review, and required that subsequent amendments to state plans be submitted with written assurances that the rates conformed to statutory standards, description of the methods used to set the rates and information on the number or percentage of LTCFs that were receiving full reimbursement. HHS/Health Care Financing Administration

(HCFA): Medicaid Action Transmittal # 81–15 (March, 1981).

15. HHS/HCFA: Medicaid Action Transmittal # 81–3 (March, 1981).

16. HHS did not publish final regulations implementing the 1972 amendment until July 1, 1976, 42 F.R. 27300.

17. OBRA of 1981, Public Law 97–35 § 2173(a) & (b).

18. *Id.* § 2161(a).

comment period.[19] Although the type of regulation involved is exempt from prior notice and comment under 5 U.S.C.A. § 553(a)(2), the Secretary of HHS has declared his intention nevertheless, to be bound by the notice requirement of the statute.[20]

The notice and comment period may be waived, however, "when the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C.A. § 553(b)(B).

The agency involved here, HHS, in promulgating the "interim final rules" waived the 30 day notice and comment in order to have implementing regulations in effect on October 1, 1982, Congress' deadline to implement budget cuts for the first quarter of fiscal 1982. HHS cited as good cause for the waiver the impracticability of implementing regulations within Congress' time limit, the explicit Congressional authorization of interim final regulations,[21] and the public interest in implementing the budget reductions as quickly as possible. Waiver of Proposed Rulemaking, 46 F.R. 47971 (Sept. 30, 1981).

Plaintiffs urge that the regulations were invalidly promulgated because the Secretary of HHS erred in finding that good cause existed for waiving the 30 day notice and comment period. The Court does not agree. Although other circuits have narrowly interpreted "good cause" in some contexts to exclude statutory deadlines,[22] the Sixth Circuit has held, in the context of EPA regulations, that a statutory deadline, coupled with state agency delays, and a history of recalcitrance and obstruction by the regulated industry constituted good cause. *Republic Steel v. Costle*, 621 F.2d 797, 803–05 (6th Cir. 1980) (holding that a

---

**19.** The APA provides in pertinent part:

"§ 553. Rule Making.

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

\*   \*   \*   \*   \*   \*

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.

\*   \*   \*   \*   \*   \*

Except when notice or hearing is required by statute, this subsection does not apply—

\*   \*   \*   \*   \*   \*

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

\*   \*   \*   \*   \*   \*

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction:

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule."

The APA also requires that a final rule be published no less than 30 days prior to its effective date, 5 U.S.C.A. § 553(d). As the questioned regulations were effective on the date published this requirement was not met. Because the interpretation of "good cause" for waiving prior publication is more generous than "good cause" for waiving notice and comment, *New Jersey v. Environmental Protection Agency*, 626 F.2d 1038, 1044 (D.C.Cir.1980), a finding of good cause for waiver of notice and comment, necessarily implies that good cause existed to waive prior publication. *See U. S. Steel Corp. v. EPA*, 605 F.2d 283, 286, 289 (7th Cir. 1979) followed in *Republic Steel v. Costle*, 621 F.2d 797 (6th Cir. 1980).

**20.** 36 Fed.Reg. 2532 (Feb. 5, 1971): *See also, Philadelphia Citizens in Action v. Schweiker*, 669 F.2d 877 (1982, 3rd Cir.).

**21.** "(B) No reduction may be made under subparagraph (A) for a quarter unless, as of the first day of the quarter, the Secretary has promulgated and has in effect final regulations (on an interim or other basis) implementing paragraphs (10)(C) and (13)(A) of section 1902(a) (as amended by the Medicare and Medicaid Amendments of 1981)." OBRA of 1981, Public Law 97–35, § 2161(a) (amending Sec. 1903 of Social Security Act by adding subsection (S)(1)(B).

**22.** *See U. S. Steel v. EPA*, 649 F.2d 572 (8th Cir. 1981) for a discussion of the issue of "good cause" in the 3rd, 5th, 8th, 9th and D.C. Circuits.

final rule, which designated parts of Ohio as a "non-attainment" area with regard to sulfur dioxide under the Air Quality Control Act, was not invalid because the EPA failed to provide for notice and comment prior to the rule's effective date). In so holding the Court noted that Notice and comment was impracticable as defined in the legislative history.

More directly on point, a district court in this Circuit has held that final interim regulations necessary to implement Congressional budget cuts under OBRA of 1981 to the Aid to Families with Dependent Children Program (AFDC), were properly promulgated on September 21, 1981 without prior notice and comment because good cause existed to waive that requirement. *Ohio State Consumers Education Assoc. v. Schweiker*, C–1–81–933 (S.D.Ohio, Jan. 4, 1982). In so holding the court noted the importance of complying with Congressional time restraints to avoid "the risk that after October 1, 1981, there would be serious injustices done in distributing admittedly reduced funds." *Id.*, Typescript at 7.

Furthermore, the Third Circuit, which has been traditionally more reluctant to find that good cause for waiver of notice and comment exists,[23] recently addressed the issue of whether Congressional deadlines, either implicit or explicit, may ever constitute good cause. *Philadelphia Citizens In Action v. Schweiker*, 669 F.2d 877 (3rd Cir. 1982). In reversing a district court decision which held new HHS regulations implementing new cuts to the AFDC program[24] to have been invalidly promulgated, the Court held that, because HHS was bound only by its own policy, not statute, to follow notice and comment procedure,[25] and because the interval between notice of need to promulgate,[26] and Congress' implicit deadline of October 1, 1981 was only 49 days, that prior notice and comment was impracticable. The Court deferred to HHS's determination that good cause existed, because, based on consideration of relevant factors, the agency had not made a "clear error of judgment." *Id.* at 462–463, citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

This Court is constrained both by Sixth Circuit precedent and the reasoning of the Third Circuit in *Philadelphia Citizens, supra*, to hold that the challenged Medicaid Regulations, 42 C.F.R. 447.250 *et seq.*, have been validly promulgated. These regulations implement both the new "reasonable and adequate" standards of The Boren Amendment to OBRA of 1980 and the extension of those standards to hospitals and a 3% reduction in federal funding under OBRA of 1981. While HHS may have initially had nine months (from December 5, 1980 to October 1, 1981) during which to promulgate new regulations which reflected The Boren Amendment, HHS had only 49 days to promulgate regulations implementing the changes in OBRA of 1981.[27] As federal defendant asserts, HHS could not meet the October 1, 1981 deadline and still

---

23. *See, American Iron and Steel Institute v. EPA*, 568 F.2d 284 (3rd Cir. 1977) (holding that interim final rules published without adequate notice were not binding on parties who were not informed their rights were to be affected), and *Sharon Steel Corp. v. EPA*, 597 F.2d 377 (holding that final rules designating the non-attainment areas under the Air Quality Control Act were invalidly promulgated because there was no notice and comment period, that a 180 day statutory deadline did not constitute good cause and that post hoc notice and comment would be inadequate). In distinguishing these two cases from *Philadelphia Citizens, infra*, the Third Circuit noted that declaring AFDC regulations invalid would have a much broader adverse impact, than the regulations held invalid in the earlier cases. At p. 886.

24. The regulations challenged in *Philadelphia Citizens, supra*, are the very same challenged in *Ohio State Consumers Ed. Assoc., supra*.

25. *See* footnote 20, page 457.

26. While HHS was aware several months prior to the enactment of OBRA of 1981 on Aug. 13, 1981 that budget cuts were necessary, the exact nature of its obligation was not known until that date. *Philadelphia Citizens*, at 884, fn. 7.

27. Prior to the enactment of OBRA of 1981, P.L. 97–35, Aug. 13, 1981, HHS was under no deadline at all to promulgate regulations implementing the Boren Amendment.

allow for a 30 day notice and comment period.

The short period of time between passage of OBRA of 1981 and the implicit deadline of October 1, 1981 is a clear example of "impracticability." The effort to keep expenditures within the budgetry allocation would have been frustrated by requiring a 30 day notice and comment period, thus rendering it "contrary to the public interest." Both of these grounds, duly published by the waiving agency,[28] satisfy the requirement of good cause. As the Secretary did not act arbitrarily and capriciously in so finding, there has been no clear error of judgment. *See Philadelphia Citizens, supra,* at 886–887. Finally, although post hoc comments are perhaps not as effective as prior notice,[29] HHS has provided opportunity for comments after publication of the interim rules, but before they are promulgated in final form, 46 F.R. 47964, 47966 (Sept. 30, 1981).

■ Under circumstances where (1) strict adherence to the notice and comment procedure of APA is a matter of agency policy rather than statutory mandate, (2) Congress has practically speaking allowed only 49 days for promulgation of implementing regulations, and (3) post hoc comments have been solicited, "the regular course of rulemaking procedure would interfere with the agency's ability to perform its functions within the time constraints imposed by Congress." *Republic Steel v. Costle, supra* at 804 (quoting *U. S. Steel Corp. v. EPA,* 605 F.2d 283, 287 (7th Cir.), *cert. denied* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980)). "Good cause" existed for HHS to waive notice and comment, and the regulations were validly promulgated.

**(b)** *The New Regulations Are Sufficient to Ensure Reasonable and Adequate Rates*

■ The plaintiff LTCFs also challenge the substantive validity of the new regulations, claiming that the data which state agencies are required to forward to HHS are inadequate to ensure that reimbursement rates are "reasonable and adequate," thus failing to reflect accurately Congressional intent. Plaintiffs must also fail on this claim at this stage of the litigation.

One effect of The Boren Amendment, which the regulations implement, was to reduce paper work and enhance state flexibility in developing and applying rate setting methodologies. Congress intended that states set their own reimbursement rates without stifling and expensive federal oversight of the methodology used, as had been the case under the former reasonable cost related standard, *see* 42 C.F.R. § 447.-252(a)(1) and (2), § 447.255(a), (b)(2), (focusing on *rates*). The data the states will be providing, average cost figures and reimbursement rates, appear sufficient for HHS to assure itself that reimbursement will be "reasonable and adequate" for the "efficiently and economically operated" facility. 42 C.F.R. § 447.252(a)(1). Probing beyond this bottom line to the underlying rate setting methodology is not required under the new standard. Relying on the information before it, this Court finds little likelihood that plaintiffs will establish either the procedural or substantive invalidity of the new Medicaid regulations.

■ Finally, plaintiffs urge that HHS erred in approving DSS's amendment to its state plan which reduced the maximum profit factor. HHS reviewed the proposed changes with the reduced level of scrutiny Congress had intended under the Boren Amendment.[30] The amount of correspon-

---

**28.** Waiver of Proposed Rule Making, 46 F.R. 47971 (Sept. 30, 1981).

**29.** "Provision of prior notice and comment allows effective participation in the rulemaking process while the decisionmaker is still receptive to information and argument. After the final rule is issued, the petitioner must

come hat-in-hand and run the risk that the decisionmaker is likely to resist change." *Sharon Steel Corp. v. EPA,* 597 F.2d 377, 381 (3rd Cir. 1979).

**30.** The DSS contends that although the proposed amendment was submitted to HHS after due public notice and subsequently approved, HHS approval was not necessary because the

dence between representatives of DSS and HHS indicate an ongoing consultative process.. The Secretary's interpretation of his own regulations and his determination that a state's action conform to them is entitled to deference. *See Williams v. St. Clair,* 610 F.2d 1244, 1248–49 (5th Cir. 1980). This Court is satisfied that the Secretary's review of assurances, pursuant to valid regulations was adequate and his decision correct.

### 3) *Plaintiffs' State Claims*

■ Plaintiffs attack the state's actions in implementing the reduction of the combined plan and variable costs profit factor from a maximum of $1.50 PPD to only $1.00 PPD. Again plaintiffs allege both procedural and substantive inadequacies.

### (a) *The Adequacy of DSS·Consultation With the MCAC*

The state plan is required to provide "methods of administration ... as are found by the Secretary to be necessary for the· proper and efficient operation of the plan."[31] HHS has interpreted this to require each state plan to provide for the establishment of an advisory council, the MCAC, 42 C.F.R. § 431.12(b). The regulation requires appointment of members who are health professionals familiar with low income medical needs, as well as Medicaid recipients, union and consumer group members, § 431.12(c), (d). The plan must provide MCAC with an opportunity to participate in policy development and program administration, § 431.12e. The state agency must provide funding and technical assistance to ensure effective recommendations, § 431.12(f). The DSS is also bound under state law to consult with the MCAC before establishing policies or procedures relating to applicable federal regulations,[32] including setting a reasonable and adequate rate of reimbursement.

Governor Milliken ordered the reduction of the Maximum Profit factor to LTCFs to $1.00 PPD, on October 22, 1981. The MCAC was first consulted about the reduction at a meeting on November 11, 1981, after the cutback had already been legislated and public notice given, but prior to the actual amendment of the state plan. Plaintiffs maintain that this level of participation is inadequate, and a violation of federal

---

maximum overall average rate reduction of $.50 out of $33.00 PPD was not "a significant change in [the state's] methods and standards for determining payment rates." 42 C.F.R. § 447.252(c); Norm Charles, Dir. of the Office of Program Development and Reimbursement, DSS, Tr. at pg. 245.

HHS was aware that DSS did not consider the change "significant" and therefore no assurances at all were necessary. Norm Charles, Tr. at 250.

**31.** 42 U.S.C.A. §§ 1396a(a)(4)(A); see also, *Id.* §§ 1396a(a)(19), and (a)(22)(D).

**32.** The pertinent portion of the statute provides:

"400.111a Establishment of policies and procedures relating to conditions of participation and requirements for providers of medical services.

"Sec. 111a. (1) The director may, after appropriate consultation with affected providers and the medical care advisory council established pursuant to federal regulations, establish policies and procedures that he or she considers appropriate, relating to the conditions of participation· and requirements for providers established by section 111b and to applicable federal law and regulations, to assure that the implementation and enforcement of state and federal laws are all of the following:

(a) Reasonable, fair, effective, and efficient,

(b) In conformance with law,

(c) In conformance with the state plan for medical assistance adopted pursuant to section 10 and approved by the United States department of health and human services,

The consultation required by this section shall be in accordance with guidelines adopted by the state department pursuant to section 24 of Act No. 306 of the Public Acts of 1969, being section 24.224 of the Michigan Compiled Laws."

Section 111(b) sets forth among other things, requirements for provider licensing, enrollment, record keeping and claims submittal. Both federal law and regulations require that state rates be "reasonable and adequate". Reduction of the maximum profit factor by $.50 PPD relates to the reasonableness and adequacy of the reduced state rate. This reduction appears to be the sort of "polic[y] or procedure[ ]" whose establishment requires prior MCAC consultation.

regulations that warrants enjoining continued implementation of DSS cutbacks and HHS's approval thereof.

Although consultation with the MCAC before the state agency makes decisions which affect "policy development and program administration . . . ," 42 C.F.R. 431.-12(e), is preferable,[33] there are circumstances where pre-implementation consultation is adequate. *See Budnicki v. Beal*, 450 F.Supp. 546, 556 (E.D.Pa., 1978) (holding that post decision notification of the MCAC was adequate where subsequent vigorous discussion indicated that the intent of the requirement had been satisfied).

Furthermore, the Sixth Circuit has held that MCAC consent is not required for state agencies to terminate optional benefits to recipients. *Benton v. Rhodes*, 586 F.2d 1, 3 (6th Cir. 1978) *cert. denied* 440 U.S. 973, 99 S.Ct. 1539, 59 L.Ed.2d 791 (1979).[34] Under both past and current regulations, any provision for a profit factor is optional with the individual participating states, and not

required by HHS as a condition of participation in Medicaid.[35] Thus, applying the *Benton* rationale, MCAC's prior consent to reductions of optional reimbursements to providers is not required.[36]

According to the facts before the Court, Michigan's MCAC was apprised of expenditure reductions necessary to compensate for reduced revenues prior to their implementation in the State Plan. The minutes of the November 10, 1981 MCAC meeting indicate that a representative of DSS explained all the cuts to be absorbed by DSS including, but by no means limited to, a profit factor reduction for LTCFs.[37] In response to all the Medicaid reductions,[38] the MCAC wrote a letter to Dr. Dempsey, Director of DSS, expressing concern that the reductions "would adversely affect the quality of care received by *recipients*" and their wish for prompt reinstatement of the appropriations when the budget allowed. MCAC Meeting Minutes, November 10, 1981 (emphasis added). The proposed amendment was for-

---

**33.** *Jennings v. Alexander*, 518 F.Supp. 877 (M.D.Tenn., 1980). *See Morabito v. Blum*, 528 F.Supp. 252, 263–65, and note 12 (S.D.N.Y., 1981).

**34.** The Sixth Circuit vacated the trial court's preliminary injunction of Ohio's termination of optional Medicaid benefits in which the trial court had issued in its findings that the state agency had failed to provide recipients with adequate notice and hearing, and for meaningful MCAC consultation. *Benton v. Rhodes*, Civ. # 76–263 and 76–306 (S.D.Ohio, May 11, 1976) (reprinted in Medicare and Medicaid Guide (CCH) ¶ 28025, reversed 586 F.2d 1, 3 (6th Cir., 1978) *cert. denied* 440 U.S. 973, 99 S.Ct. 1539, 59 L.Ed.2d 791 (1979)). In its opinion reversing the Southern District of Ohio, the Sixth Circuit focused on the adequacy of pretermination process for recipients, and only briefly adverted to the advisory nature of the MCAC. *Id.*, 586 F.2d at 3. *See Morabito v. Blum*, 528 F.Supp. 252, 264–65 (S.D.N.Y., 1981).

**35.** *See* 41 F.R. 27300, 27303 (July 1, 1976) (regulations implementing the reasonable cost related reimbursement standard); Statement of Basis and Purpose clarifying profit opportunities for LTCFs under Medicaid, 43 F.R. 4861 *et seq.* (Feb. 6, 1978); 46 F.R. 47964, 47965 (Sept. 30, 1981). (Preamble to Interim Final Regulations implementing the "Reasonable and Adequate" reimbursement standard.)

**36.** It is arguable that *Benton v. Rhodes, supra,* applies only to the federal requirements for meaningful participation, and that under Michigan law, MCAC consultation is required even though only optional as opposed to mandatory, benefits are involved. *See* M.C.L.A. § 400.-111a1 (1981). However, the Michigan provision implements the federal requirements and the value of consistency is evident.

**37.** Executive Order 1981–9 (Oct. 22, 1981) enacted budget cuts totaling $270 million. DSS's allocations were reduced by $152 million dollars. Of that amount $3,100,000 was borne by Medicaid providers in the form of a profit factor reduction: 2% of DSS's loss and only 1.1% of the overall reduction. Because the federal government matches state expenditure 1:1, the $3.1 million savings to Michigan will reduce the LTCF's profit factor by 6.2 million dollars. *See* Public Notice—Cost Containment Measures for Michigan Medicaid Program (November 1, 1981).

**38.** Other reductions under Executive Order 1981–9 which affected Medicaid programs included elimination of payment for certain Friday/Saturday Hospital Admissions, for routine medical care given in the hospital emergency room, review of length of hospital stay, and implementation of cost limits to hospital reimbursement. In addition to a reduction in the profit factor, LTCFs also lost a rate increase.

warded to HHS for its approval on December 2, 1981, and became effective January 1, 1982.

Once the MCAC received pre-implementation notice of the profit factor reduction, any inadequacy of the discussion of that issue was due, in large part, to an internal committee judgment concerning the most effective use of admittedly limited resources. The MCAC had experienced cutbacks to the profit factor in 1980, enacted without any consultation.[39] At that time MCAC expressed their concern to both the legislative and executive branches that the reductions would impact adversely on provider participation and client care. MCAC Meeting Notes, October 8, 1980 (addressing profit factor reductions enacted December 5, 1980 to take effect December 15, 1980. *See* Mich. P.A. 1980–315, § 97).

From this past history, the Court is justified in inferring that MCAC would not have been totally ignorant that LTCFs' profit factors could be a target of budget reductions. The MCAC's chairman could control the meeting's agenda and correct faulty minutes. His ongoing dialog with DSS concerning the priorities of MCAC centered on minimizing the reductions' direct impact on recipients.

In addition, time constraints between DSS's recommendation of budget cuts (Memo to Dr. Dempsey from Paul Allen (Sept. 29, 1981)) and the date of enactment on October 22, 1981 together with DSS's past experience that the MCAC focused on recipient, rather than provider interests, tend to mitigate any failure to consult with MCAC before the budget reductions were a fait accompli.

Ultimately the fact that MCAC did not address profit factor reductions in detail reflects perhaps not so much on a lack of timely or adequate notice by the DSS as it does MCAC's internal decision to focus its limited resources where its input would benefit the greatest number of recipients. While the consultation process, in an ideal world, would have been better if implemented in the early stages of budget formulation, the exigencies of a fiscal deadline, the presence of representatives of the Nursing Home industry on the MCAC, and its implicit ratification of the reductions in its letter of concern to Dr. Dempsey are all factors which, when taken together prevent this Court from holding that notice and consultation were so inadequate as to warrant preliminarily enjoining implementation of the profit factor reduction.

(b) *The Reasonableness and Adequacy of the Rate After the Profit Factor Reduction*

Substantively, plaintiffs claim that implementation of the profit factor reduction will result in reimbursement rates that are not "reasonable and adequate." Plaintiffs elicited testimony to the effect that payment of an unreduced "profit factor" in addition to a facility's "actual allowable costs" is necessary to reimburse actual costs incurred.[40]

Plaintiffs first challenge the basis of DSS's reimbursement methodology under the Boren Amendment: the assumption that an LTCF whose allowable costs are at the 80th percentile of all facilities in its class, is economically and efficiently operat-

---

**39.** Public Act 1980, No. 315 § 97 reduced the profit factor to ICFs only from a maximum of $1.50 PPD to $1.00 PPD. This reduction was in effect from Jan. 1, 1980 to Sept. 30, 1981 when it was restored to $1.50 PPD from October 1, 1981 to December 31, 1981. The profit factor for both ICFs and SNFs was again reduced to $1.00 PPD by Executive Order 1981–9 (Oct. 22, 1981).

**40.** Plaintiffs' underlying claim seems to be that the DSS's determination of allowable costs and the variable and plant cost ceilings are artificially low and inadequate to reimburse even those facilities that meet the test of being "eco-

nomically and efficiently operated." Because of this shortfall, even facilities who maintain costs below DSS's artificial limits need to retain a portion of the difference—the "profit factor"—in order to survive. The plaintiffs, in seeking a preliminary injunction on the limited issue of profit factor reduction have not squarely addressed the underlying question of the entire reimbursement methodology, and have not provided the Court with adequate data to address this issue. Therefore the Court reserves the question for another day, when properly presented.

ed. While it is true that the DSS has provided no data to substantiate or explain its assumption, at this stage of the proceedings the DSS is under no obligation to do so. The burden of proving that this method does not result in reasonable and adequate reimbursement rates is upon plaintiffs who must adduce enough evidence to demonstrate a probability of success on the merits. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441, 94 S.Ct. 1113, 1125, 39 L.Ed.2d 435 (1974).

Out of approximately 300 proprietary LTCFs that participate in Title XIX, plaintiffs have produced limited data for only 12, and that is not the most current audited data. On the basis of these limited figures, plaintiffs are asking the Court to conjure and infer facts rather than to find them. This the Court will not do.

Plaintiffs also contend that the type of reduction implemented by the state is based "solely on the basis of budgetary appropriations," contrary to Congressional intent.[41] Plaintiffs' argument ignores the developmental history of Medicaid reimbursement standards. *Supra*, pp. 454–457. When interpreted in that context, the language reflects Congressional concern that the Boren Amendment not be read as repealing the rate setting process and returning to pre 1972 reimbursement schemes which determined daily rates simply by dividing the annual budget allotment by the number of patient days.

The Court is convinced that the current reimbursement rate is not based "solely on . . . budgetary appropriations," but represents considered judgments of what rates will both reflect the, actual costs incurred and also allow the state to comply with its constitutional obligation to balance its budget. Plaintiffs seek a ruling that the rates as a whole do not reflect providers' costs. They have not, however, provided sufficient facts, nor framed the issue of this motion in a manner which allows the Court to address the much broader question.

Finally, plaintiffs' claim that the related information forwarded to HHS, as required by 42 C.F.R. 447.255, did not constitute "quantified estimates". Plaintiffs interpret this phrase "quantified estimates" to require a review of all facilities on an individual basis to determine which are impacted, and by how much. Plaintiffs' interpretation finds no support in statute, regulations, legislative history or any of the testimony before the Court. On the contrary, the essence of the Boren Amendment was to reduce this very type of detailed oversight.

Furthermore, "quantified estimates" need only be submitted when DSS makes a "significant change in its methods and standards for determining the rate[s]." 42 C.F.R. 447.255(a) (effective Sept. 30, 1981). When calculated as an integral part of the PPD reimbursement rate, as plaintiffs urge, the average reduction of $.317 PPD is less than a 1% decrease in the average daily reimbursement rate of $33.961, before the profit factor was reduced. The percentage change would not have been significant under the stricter old standards[42] and is not under the more flexible standards currently in effect as applied by the DSS in forwarding the amendment to HHS for approval. *See* letter to Judith Stec from John Dempsey (December 2, 1981). The fact that DSS scrupulously followed public notice requirements mandated for significant changes

---

**41.** Conference Agreement, the Boren Amendment, § 9, OBRA of 1980, P.L. 96–499 (1980) U.S.Code Cong. & Ad.News 5526, 5944. The Congressional admonition must be taken with a grain of salt since the subsequent federal cutbacks obviously had an impact on a state's financial health, a factor Congress could not have ignored.

**42.** Under the former regulations which implemented the reasonable cost related standard, a change was "significant" in the context of triggering the obligation of notice, if it would "in-crease or decrease Medicaid payments for that service by one percent or more during the twelve months following the effective date of change" 42 C.F.R. § 447.205(a). The new standard of "a significant change" does not specify a threshold amount, in order to provide states more flexibility. *See* 42 C.F.R. § 442.254(a) (effective Sept. 30, 1981); *see also* 46 F.R. 47966–67 (requiring public notice of a "major change on its method of calculating payment rates"). *See also* Footnote 30 at pg. 459.

does not warrant the inference that DSS considered this change to be significant. Assurances and related information, including "quantified estimates" were not required at all. On these facts, DSS submitted more than was required.

■ Plaintiffs have not demonstrated a likelihood of success either on the claims that HHS invalidly promulgated substantively inadequate regulations, or that state action in reducing the Profit Factor was either invalid for lack of MCAC participation or failing to provide for reasonable and adequate rates. Plaintiffs' inability to establish the likelihood of success on the merits is sufficient alone to deny preliminary injunctive relief. The Court, however, is impelled to comment on plaintiffs' similar failure to establish that irreparable injury, the balance of hardships and the public interest justify enjoining the Profit Factor reduction.

### B. Irreparable Injury

Plaintiffs have relied on the doctrine of sovereign immunity as interpreted in *Edelman v. Jordan*, 415 U.S. 651, 662–69, 94 S.Ct. 1347, 1355–58, 30 L.Ed.2d 662 (1974), and as most recently reaffirmed in *Florida Dept. of Health v. Florida Nursing Home Assoc.*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). Under this line of cases, even if a plaintiff should prevail in federal court upon his claims against a state agency for wrongly withheld reimbursement, absent a clear waiver by the state of immunity from suit to recover money damages, the successful claimant is limited to prospective relief only. *See Edelman v. Jordan*, 415 U.S. at 664, 94 S.Ct. at 1356.

Plaintiff nursing homes argue that every state reimbursement date which passes while the reduction is in effect injures the providers irreparably, because they cannot recover the payments that were wrongfully withheld. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 954, 3 L.Ed.2d 988 (1959) (holding that plaintiff's right to jury trial in antitrust suit for treble damages can't be defeated by defendant's equitable counterclaim for declaratory judgment). While it is true that past payments may not be recovered as long as Michigan has not waived its sovereign immunity, plaintiffs are left with an adequate remedy at law in Michigan's Court of Claims.[43] Providers may challenge the adequacy of state reimbursement rates without the profit factor in the state Court of Claims.[44]

Plaintiffs confuse the notion of irreparable injury with the putative inconvenience of resort to a state forum. As long as an adequate remedy of law is open to plaintiffs in state court, the Eleventh Amendment's bar to retroactive relief from this Court does not constitute irreparable injury. *See Beacon Theatres v. Westover, supra* at 506–07, 79 S.Ct. at 954, *cf. Alabama Hospital Assoc. v. Rebecca Beasly*, Civ. Action # 81–0492 (M.D.Ala. Oct. 7, 1981) (Medicare and Medicaid Guide (CCH) ¶ 31,564).

Plaintiffs also urge that reduced quality of care which the residents may suffer because the provider's funding is reduced constitutes irreparable injury. Although plaintiffs may have standing to raise potential injury to third parties, *Seneca Nursing Home v. Kansas State Board of Social Wel-*

---

**43.** The pertinent portion of the Court of Claims Act provides:

"(1) The Court has power and jurisdiction:
(a) to hear and determine all claims and demands, liquidated and unliquidated, ex contractu . . . against the state and any of its departments, commissions, boards, institutions, arms or agencies." M.C.L.A. § 600.-6419(1)(a).

**44.** Because plaintiffs cannot secure retroactive relief where sovereign immunity has not been waived, their remedy in federal courts is not

"an adequate remedy." Therefore plaintiffs' suit against DSS would not be barred by M.C.L.A. § 600.6440 (remedy in federal court as bar to jurisdiction).

Individual providers may also appeal the manner in which allowable costs are determined, and the rates based thereon. The state plan expressly provides an appeals process to adjudicate questions of individual provider payments and make retroactive adjustments where the provider is so entitled. State Plan § VIII.

*fare,* 490 F.2d 1324, 1328–29 (10th Cir., 1974), the facts before the Court do not support a finding that LTCF residents as a whole will be irreparably injured by continuing the profit factor reduction.[45]

### C. *Balancing the Hardships*

Plaintiffs ask this Court to determine, on the basis of bare dollar amounts, that out of budget cuts to DSS totalling 152 million dollars, a cut amounting to $3,100,000 has been misallocated, and should be shifted to others. Plaintiffs misperceive the import of their request. In actuality, plaintiffs are lobbying this Court to exercise a judicial veto over decisions of both legislators and administrators who have made careers of evaluating funding alternatives and their ramifications. "[T]he judiciary may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

The evidence is clear that both the DSS and legislative committees considered reimbursement with greater impact on LTCFs and rejected them.[46] The ultimate cutbacks settled on by the DSS—reductions of AFDC payments, and tightening of eligibility requirements, reduced funding for juvenile runaways, foster care and adoption programs and pharmacy, hospital admissions and emergency room coverage—(*See* Executive Order 1981–9 (Oct. 22, 1981), demonstrate that LTCFs have not been asked to shoulder a disproportionate burden. Plain-

tiffs' financial harm must be balanced against the more immediate harm which will be suffered by those who would have been direct recipients, but for the increase of plaintiffs' share of severely limited largesse.

### D. *The Public Interest*

Finally, the Court must determine whether the public interest will be served by enjoining the Profit Factor reduction. Although it is true that the public is served by the availability of LTCFs for those who need that kind of care, this service benefits a limited portion of the population. In contrast, the public at large has an interest in the conservation of the state treasury and ensuring that the legislative spending not exceed the government's revenues. A budget deficit violates Michigan's Constitution, M.C.L.A. Art. 5 § 18, and the public interest. "[W]here an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the Court may in the public interest withhold relief until a final determination of the rights of the parties, though postponement may be burdensome to the plaintiff." *Yakus v. U. S.,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944).

Therefore plaintiffs' Motion for Preliminary Injunction is DENIED.

IT IS SO ORDERED.

---

**45.** An incremental reduction in the quality of care for a period of time does not constitute irreparable injury. The Supreme Court has recently held that while Medicaid recipients are entitled to continuing care even if their facility is decertified, or closes for other reasons, they have no property right to remain in the homes of their choice, that would entitle them to a hearing on the decision to close their residence. *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 784, 100 S.Ct. 2467, 2475, 65 L.Ed.2d 506 (1980).

Plaintiffs have adduced evidence that one facility will be forced to reduce the number of beds certified for Medicare, or close its doors. If that happens, the resulting transfer may

cause irreparable injury to some of the residents. *See Town Court Nursing Center supra* at 784, n.16, 100 S.Ct. 2475, n.16. No such closing, however, is imminent.

**46.** Norm Charles, Director of the Medical Services Administration of DSS testified that other more drastic cutbacks had been considered including: (1) Reducing the profit factor to a maximum of $.50 PPD, (2) Eliminating ICF from Medicaid coverage entirely, and (3) Setting variable and plant costs at the 60th or 70th percentile (now set at the 80th percentile). Any of the options would have had a greater impact on LTCF reimbursement rates than the reduction at issue. Tr. at 246–47.