The MASSACHUSETTS FEDERATION OF NURSING HOMES, INC., et al., Plaintiffs,

v.

The COMMONWEALTH OF MASSACHUSETTS, et al., Defendants.

Civ. A. No. 91–11366–C.

United States District Court, D. Massachusetts.

Aug. 15, 1991.

Kenneth A. Behar, Behar & Kalman, Boston, Mass., for plaintiffs.

William L. Pardee, Judith S. Yogman, Office of Atty. Gen., Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Senior District Judge.

This action arises out of the federal Medicaid program, specifically, 42 U.S.C. § 1396a (1983 & Supp.1991) and its implementing regulations. Plaintiffs in this motion contest the change in management minute ranges used to calculate reimbursement payments to Medicaid providers. Plaintiffs have filed this motion for a preliminary injunction to enjoin defendants' use of the new ranges. The state defendants have filed a motion to dismiss on the basis of the eleventh amendment and for lack of standing on the part of plaintiff associations. For the reasons stated below, the plaintiffs' motion for a preliminary injunction should be denied. Defendants' motion to dismiss should be allowed in part. Pursuant to Fed.R.Civ.P. 52(a), the following constitute the Court's Findings of Fact and Conclusions of Law on plaintiffs' application for a preliminary injunction.

## I. FINDINGS OF FACT

1. Plaintiff, the Massachusetts Federation of Nursing Homes, Inc., is a non-profit Massachusetts corporation with a usual place of business in Dedham, Massachusetts. The Massachusetts Federation of Nursing Homes, Inc., acts as a trade association for approximately 400 nursing home facilities.

2. Plaintiff, the Association of Massachusetts Homes for the Aging, Inc., is a non-profit Massachusetts corporation with a usual place of business in Boston, Massachusetts. The Association of Massachusetts Homes for the Aging, Inc., acts as a trade association for approximately 80 nursing facilities that provide services to the elderly.

3. Plaintiff, Hospital Cottages for Children d/b/a Baldwinville Nursing Home, is a non-profit corporation which acts as a duly licensed nursing facility in Baldwinville, Massachusetts.

4. Plaintiffs, Richard E. Furlong and Elizabeth E. Furlong d/b/a Westfield Manor Nursing Home, operate a duly licensed nursing facility in Westfield, Massachusetts.

5. Plaintiff, Amherst Nursing Home, Inc., is a for profit corporation that operates a duly licensed nursing facility in Amherst, Massachusetts.

6. Defendant, the Massachusetts Department of Public Welfare ("DPW"), is the state agency in charge of administering the Commonwealth's Medicaid program.

7. Defendant, Joseph Gallant, is the acting Commissioner of the DPW.

8. Defendant, Bruce M. Bullen, is an associate commissioner of the DPW in charge of supervising and administering the Commonwealth's Medicaid program.

9. Defendant, Rate Setting Commission ("RSC"), is the state agency that establishes the reimbursement rates at which the plaintiffs are paid by the DPW for all types of health services rendered to publicly-assisted patients eligible under the Medicaid program.

10. Defendant, Louis Sullivan, is the Secretary of the Department of Health and Human Services ("HHS"). Sullivan, through the Health Care Financing Administration ("HCFA"), reviews and approves Medicaid state plans and amendments thereto relating to the reimbursement rates at which nursing facilities are paid for services rendered under the Medicaid Program.

11. Before 1988, the Commonwealth used a so-called "retrospective" method of reimbursement for long term care services. Under this retrospective system, a health care provider received an interim rate of reimbursement that was based upon the costs incurred during the previous rate year. At the close of the rate year, the provider received a final rate that was based upon actual costs incurred for that rate year, and a final settlement would be made based on the difference between the interim rate and the actual rate.

12. In 1986, the RSC, the Department of Public Health, and the DPW received a federal grant to study and design a prospective reimbursement methodology using case mix data on patients in long term care facilities. "Case mix" refers to patients' levels of sickness, or acuity. Case Mix Advisory Committee meetings were held to develop the prospective system. Representatives of the nursing home industry participated in these meetings.

13. In contrast to a retrospective system, under a prospective system, the reimbursement rate is established at the beginning of the rate year, and is not changed, except when necessary to reflect unforeseen costs by way of an administrative adjustment. Under the prospective system, there is no final settlement. Rather, if a facility's costs exceed the established rate, the facility can keep the difference. If, on the other hand, a facility's actual costs exceed the set rate, the facility must absorb the difference. In this way, the intended goal of a prospective system is to encourage and reward efficiency. In addition, the case mix feature of the prospective system encourages facilities to admit patients who require more intensive care.

14. Under Massachusetts' particular prospective reimbursement system, a facility is paid at one of ten rates based on the level of care required by its patients. More specifically, historical cost data from a specific year is used to calculate three sets of ten different theoretical rates. Each of the three sets of theoretical rates is for a particular Nursing Home Reimbursement Area. In addition, ten case mix categories, or management minute ranges, are calculated. The management minute ranges are numbered from one to ten. The lower ranges reflect patients requiring the least amount of care, and therefore, the theoretical rates for the lower categories are correspondingly lower. The rates are then applied to the number of patients in the ten billing, or case mix, categories to determine the amount of reimbursement to which the facility is entitled. The RSC anticipated that 10% of all patients would fall in each category. Thus, the facilities' ten individual reimbursement rates are derived based on facility-specific cost data and the proportion of patients in each case mix category, combined with the theoretical rate for the relevant Nursing Home Reimbursement Area.

15. In order to measure patient acuity, the DPW, in conjunction with the RSC, developed in 1988 a measuring tool called the "Management Minutes Questionnaire" ("MMQ"). The MMQ measures the level of patient acuity by asking a series of questions designed to elicit the length of time in minutes spent with each patient. The more hours spent on the patient, the higher the billing category in which the patient is included.

16. Prior to 1989 and the development of the prospective system, the DPW used a tool called the "Inspection of Care" ("IOC") to collect data concerning patients' individual nursing care requirements. The IOC

was not, however, used as a reimbursement tool.

17. Beginning October 1, 1988, and effective through December 31, 1988, in an experiment to test the new system, seventeen long term facilities were assigned prospective rates. In 1989, these same seventeen facilities were given a rate effective for one rate year, from January 1, 1989, to December 31, 1989. Having tested the new system, in 1990, one hundred and ninety facilities were put on the prospective case mix system in phase one of its implementation. For phase one, the RSC utilized cost data from 1988, and acuity, or case mix data (derived from the MMQs) from 1989. The remaining facilities received their prospective rates in 1991.

18. On March 30, 1990, the DPW submitted a state plan amendment (90–07) to the HCFA and made assurances to the federal government that the 1990 prospective reimbursement rates were fair, reasonable and adequate to meet the costs that must be incurred by efficiently and economically run facilities. On August 27, 1990, in response to questions from the HCFA, the DPW submitted a letter and revised assurance statement to HCFA. HCFA approved the 90–07 state plan amendment, effective October 1, 1990.

19. The approved plan referred to the management minutes as follows:

> b. *Casemix Categories*
>
> There will be ten (10) casemix categories which are based upon the intensity of services ("management minutes") needed by the facility's patients. The Rate Setting Commission shall calculate a theoretical nursing rate for each casemix category in each NHRA. This theoretical nursing per diem rate for each casemix category may be adjusted from year to year to reflect changes due to inflation. The following is the methodology used to calculate a theoretical nursing rate for each casemix category in each NHRA....

This section of the plan then sets forth the regression formula used to calculate the theoretical rate. The plan did not set forth the management minute ranges.

20. On January 25, 1991, the RSC filed with the State Secretary 1991 prospective rates of payment for each of the substantial majority of the plaintiff nursing facilities. By letter dated January 24, 1991, defendant Bullen advised all nursing facilities that the management minutes case mix categories codified at 114.2 Code Mass. Regs. 5.09(5) were to take effect on January 1, 1991.

21. For services rendered in January, the DPW paid the nursing facilities in accordance with the following management minute ranges as contained in the state regulation:

| Category | Range | Median |
|---|---|---|
| 1 | 0 – 60 | 48 |
| 2 | 60.1 – 78 | 78 |
| 3 | 78.1 – 108 | 92 |
| 4 | 108.1 – 125 | 110 |
| 5 | 125.1 – 136 | 130 |
| 6 | 136.1 – 158 | 158 |
| 7 | 158.1 – 170 | 164 |
| 8 | 170.1 – 181 | 180 |
| 9 | 181.1 – 203 | 184 |
| 10 | 203.1 – | 219 |

22. In calculating the January, 1991, theoretical rates, the RSC used historical expenses from 1988. As noted, however, there was no MMQ data for the 1988 year, as that form was not employed during 1988. Thus, the DPW, in conjunction with the RSC, attempted to convert the information contained in the 1988 IOCs to approximate the MMQ.

23. A meeting was held in the fall of 1990 to discuss problems with the case mix measurement. Represented at the meeting was the RSC, DPW and both trade associations who are plaintiffs in this action.

24. When the DPW received the January billings, approximately forty-two percent of the Medicaid patients served by the facilities were classified as being in category ten, the category of patients with the heaviest care needs.

25. According to the affidavit of Paul Dreyer, this breakdown reflected an artificial increase in acuity resulting from the change in forms from the IOC to the MMQ. Specifically, according to Dreyer, the new forms allowed for more information, thereby resulting in higher overall scores. In

addition, the disproportionate number of patients falling in the high end of the range resulted from providers' additional experience in filling out the forms. Although plaintiffs dispute the exact percentages set forth in Dreyer's affidavit, they do not appear to dispute that acuity levels had been artificially inflated.

26. At a meeting held on March 27, 1991, the DPW informed industry representatives that the management minute ranges would be changed effective February 1, 1991. To assure adequate reimbursement to the facilities, however, the RSC proposed, and eventually adopted, two regulatory safeguards. First, an add-on was developed so that each facility would receive no less than its 1988 allowable costs, plus three years of inflation (21.43%). Second, the RSC instituted a petition process whereby any facility claiming that its reasonable costs had risen above the base level due to an increase in patient acuity could present such evidence to the RSC to determine if a rate adjustment was warranted.

27. On March 29, 1991, the DPW submitted a new state plan amendment, 91–07, effective January 1, 1991, to the HCFA, which plan provided for the prospective reimbursement system for all nursing facilities. This amendment, like 90–07, did not include the management minute ranges.

28. On the same date, March 29, 1991, the DPW increased for each case mix category the management minutes ranges set forth in 114.2 Code Mass.Regs. § 5.09(5) to the following:

| Category | Range |
|---|---|
| 1 | 0 – 73 |
| 2 | 73.1 – 89 |
| 3 | 89.1 – 114 |
| 4 | 114.1 – 132 |
| 5 | 132.1 – 148 |
| 6 | 148.1 – 170 |
| 7 | 170.1 – 201 |
| 8 | 201.1 – 227 |
| 9 | 227.1 – 255 |
| 10 | 225.1 – |

29. This change was to be applied retroactively to February 1, 1991. In essence, this increase in the management minute ranges lowered the amount of reimbursement facilities would receive, as patients would be classified in lower categories.

30. The management minute ranges listed in paragraph 28 were based upon 1989 acuity data. Acuity data from 1988 was used to calculate theoretical rates.

31. On April 4, 1991, the RSC deleted 114.2 Code Mass.Regs. § 509(5), effective February 1, 1991, by emergency regulation.

32. The effect on the plaintiffs of the change in management minute categories from January to February per month is approximately $9,421 for Baldwinville, $8,030 for Westfield Manor Nursing Home, and $8,494 for Amherst Nursing Home.

## II. CONCLUSIONS OF LAW

### A. Motion To Dismiss

■ The first question that must be taken up is the state defendants' motion to dismiss.[1] As its first basis for dismissal, the state defendants assert that this Court lacks jurisdiction over several of plaintiffs' claims by virtue of the eleventh amendment. This Court agrees that it lacks jurisdiction over all claims asserted against the Commonwealth, the DPW and the RSC. Likewise, this Court does not have jurisdiction over pendent state claims asserted against the state officials.[2]

The eleventh amendment provides that federal courts shall not have jurisdiction over "any suit in law or equity, commenced or prosecuted against one of the United States." U.S. Const. amend. XI. It is well-settled that, absent a waiver of sovereign immunity by the state or abrogation of sovereign immunity by Congress, the eleventh amendment bars suits against a state, its agencies and its departments. *Pennhurst State Sch. & Hosp. v. Halderman,*

---

1. Plaintiffs requested oral argument on the motion to dismiss. The questions at issue in defendants' motion to dismiss are straightforward, and this Court would not be assisted by oral argument.

2. The pendent state claims are asserted in paragraphs forty-eight through fifty of the complaint.

465 U.S. 89, 100, 104 S.Ct. 900, 907–08, 79 L.Ed.2d 67 (1984). This bar applies regardless of the form of relief requested by a plaintiff. *Id.* There is no contention that Massachusetts, in this case, has waived its immunity. Likewise, there is no indication in 42 U.S.C. § 1396 of a congressional intent to abrogate participating states' sovereign immunity. *Amisub (PSL), Inc. v. State of Colo. Dep't of Social Servs.*, 879 F.2d 789, 793 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990). Thus, plaintiffs' claims against the Commonwealth, the DPW and the RSC should be dismissed.

For similar reasons, the pendent state claims asserted against the state officials should be dismissed. Suits against state officials alleging a violation of federal law are permissible to the extent that they seek prospective, not retroactive, relief and have only an ancillary effect on the state treasury. *Edelman v. Jordan*, 415 U.S. 651, 666–68, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974); *Virginia Hosp. Ass'n v. Bailes*, 868 F.2d 653, 662 (4th Cir.1989), *aff'd on other grounds sub nom. Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). The Supreme Court, however, has explicitly stated that, unlike the situation when the state official is accused of violating federal law, "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law."

*Pennhurst State Sch. & Hosp.*, 465 U.S. at 106, 104 S.Ct. at 911. Pendent jurisdiction does not override these eleventh amendment principles. *Id.* at 121, 104 S.Ct. at 919. Consequently, the pendent state claims asserted by plaintiffs against the state officials should also be dismissed.[3]

### B. *Preliminary Injunction*

■ It is settled law that a plaintiff bears the burden of satisfying four criteria in order to be entitled to a preliminary injunction. The Court may grant such an injunction if it finds that: (1) the plaintiff has exhibited a likelihood of success on the merits; (2) the plaintiff will suffer irreparable injury if the injunction is not granted; (3) such injury outweighs any harm which granting injunctive relief would inflict on the defendant; and (4) the public interest will not be adversely affected by the granting of the injunction. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991); *Camel Hair & Cashmere Inst. of Am.*, 799 F.2d at 12; *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). The First Circuit has stated that "the probability-of-success component has loomed large in cases before this court." *Auburn News Co. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *see Lancor v. Lebanon Hous. Auth.*, 760 F.2d 361, 362 (1st Cir.1985) ("Of these four factors, the probability-of-success compo-

---

**3.** Plaintiffs, anticipating this Court's ruling on defendants' motion to dismiss, request that the claims be "remanded" to state court. The appropriate procedure is to dismiss the claims outright, but certainly, such dismissal is without prejudice to plaintiffs, who may pursue their claims in state court.

Defendants' second argument in its motion to dismiss is that the trade association plaintiffs lack standing to assert claims under 42 U.S.C. § 1396a(a)(13)(A). *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Defendants argue that the trade association plaintiffs lack standing because the claim under the Boren amendment requires the participation of individual nursing facilities.

At this stage, the Court's attention is limited to the question of whether preliminary injunctive relief is appropriate. The First Circuit has not-

ed that a plaintiff association should not be said to lack standing when seeking injunctive relief merely because its members' claims will have to be considered individually to decide if they are entitled to money damages. *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 13 (1st Cir.1986). Following this reasoning, several courts in the medicaid context have focused on the prospective nature of the relief requested in concluding that the association had standing. *See, e.g., Kansas Health Care Ass'n v. Kansas Dept. of Social & Rehabilitative Servs.*, 754 F.Supp. 1502, 1512 (D.Ka.1990); *California Ass'n of Bioanalysts v. Rank*, 577 F.Supp. 1342, 1347 (C.D.Cal. 1983). At this stage, the Court sees no barrier to plaintiffs' standing, although defendants may raise the standing question at a later time if the posture of the case changes.

nent in the past has been regarded by us as critical in determining the propriety of injunctive relief.").

The first criterion that plaintiffs must demonstrate is that there is a likelihood of success on the merits. *Agency Rent–A-Car, Inc. v. Connolly,* 686 F.2d 1029, 1034 (1st Cir.1982); *A–Copy, Inc. v. Michaelson,* 599 F.2d 450, 451–52 (1st Cir.1978). A court should not grant an injunction when there is a close factual dispute that could go either way at trial. *A–Copy, Inc.,* 599 F.2d at 451. Nonetheless, a plaintiff need not prove that he or she is certain to win. As noted recently by the First Circuit, a court's determination on the merits is a statement of probabilities, and thus "a party losing the battle on likelihood of success may nonetheless with the war at a succeeding trial on the merits." *Guilbert,* 934 F.2d at 6. Furthermore, the plaintiff's burden of showing probable success on the merits is higher or lower depending on the corresponding harm to the defendant. *A–Copy, Inc.,* 599 F.2d at 451. In light of this standard, we look to the plaintiffs' main claims in their complaint.

Given this Court's determination that plaintiffs' pendent state claims should be dismissed, it is only necessary to examine defendants' alleged violation of federal law in evaluating plaintiffs' likelihood of success on the merits. Under Title XIX of the Social Security Act, often called the Medicaid Act, states receive federal grants for medical assistance to low-income individuals who are aged, blind, disabled, or members of families with dependent children. 42 U.S.C. § 1396 (1983 & Supp.1991). Participation in the Medicaid program is voluntary on the part of the states, but a state that chooses to participate must comply with all federal Medicaid laws and regulations. *Amisub (PSL), Inc.,* 879 F.2d at 794. These federal requirements are both procedural and substantive. Turning first to the procedural requirements, each state participating in the Medicaid program must submit a Medicaid plan to the HCFA. 42 U.S.C. § 1396a (1983 & Supp.1991). The necessary contents of this plan are set forth in 42 U.S.C. § 1396a(a) (1983 & Supp. 1991). Any change in the payment rates established in the state plan requires the state Medicaid agency, in Massachusetts the DPW, to submit plan amendments to HCFA. 45 C.F.R. § 205.5(a) (1990).

As an additional procedural requirement, the state must make findings and provide assurances satisfactory to HCFA that the rates established by the state meet the substantive requirements of the Boren amendment of the Omnibus Reconciliation Act of 1980, 42 U.S.C. § 1396a(a)(13)(A) (1983 & Supp.1991). The process that the state agency must go through in making the required findings does not require special studies, nor must the findings be written. *Colorado Health Care Ass'n v. Colorado Dep't of Social Servs.,* 842 F.2d 1158, 1168 (10th Cir.1988). The state agency simply must undertake a "reasonably principled analysis" of their rates. *Folden v. Washington State Dep't of Social & Health Servs.,* 744 F.Supp. 1507, 1532 (W.D.Wash.1990). The agency then makes assurances to HCFA based on these findings.

Turning to the substantive mandate of the Medicaid act, the Boren amendment requires that the rates:

> are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality;

*Id.* In enacting the Boren amendment, Congress rejected previous reimbursement principles as promoting excess costs, and instead adopted a standard which would promote efficiency. *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1310 (2d Cir.1991). Specifically, Congress significantly altered the federal standard, rejecting the former "reasonable cost" standard, in favor of a standard that reimburses for "costs which must be incurred by efficiently and economically operated facilities." *Wisconsin Hosp. Ass'n v. Reivitz,* 733 F.2d 1226, 1228 (7th Cir.1984).

Plaintiffs' argument in support of their motion for a preliminary injunction focuses on defendants' alleged procedural violations of the Medicaid act by changing the management minute ranges. Plaintiffs' argument is three-fold. First, plaintiffs argue that by changing the management minute ranges, the defendants violated 42 C.F.R. § 447.205(a) (1990) which states that the DPW "must provide public notice of any significant change in its methods and standards for setting payment rates for services." Second, plaintiffs argue that the change in management minute ranges violated 42 C.F.R. § 447.253(g) (1990), which states that the DPW "must pay for inpatient hospital and long term care services using rates determined in accordance with methods and standards specified in an approved State plan." Plaintiffs argue that defendants violated this regulation by using one set of acuity date for payment purposes, and a different set of acuity data for calculating the theoretical rates beginning in February, 1991. Plaintiffs also maintain that defendants violated this regulation by failing to amend the plan to reflect a change in payment rates, namely, the change in management minute ranges. Third, plaintiffs contend that defendants failed to make adequate assurances and findings as required by 42 C.F.R. §§ 447.-253(a) and (b)(1)(i) (1990). Specifically, plaintiffs argue that defendants have not made assurances to HCFA concerning a reimbursement methodology that uses two different sets of acuity data, one for payment purposes and the other for purposes of calculating the theoretical rate.

According to the language of these regulations, a state agency does not even encounter the requirements of these regulations unless the change or amendment is to a "method or standard"; therefore, the starting point for this Court is to determine whether the management minute ranges are a "method or standard" within the meaning of the regulations relied on by plaintiffs. *See Illinois Council on Long Term Care v. Bradley*, 759 F.Supp. 1309,

1312 (N.D.Ill.1991). Only if the management minute ranges constitute a "method or standard" are plaintiffs correct in asserting that the defendants violated federal law by failing to include the management minute ranges in the state plan, by failing to amend the state plan when they changed the management minute ranges and by failing to make adequate assurances regarding the management minute ranges. Defendants, in response, maintain that the following section in the state plan (90–07) was sufficient:

b. *Casemix Categories*

There will be ten (10) casemix categories which are based upon the intensity of services ("management minutes") needed by the facility's patients. The Rate Setting Commission shall calculate a theoretical nursing rate for each casemix category in each NHRA. This theoretical nursing per diem rate for each casemix category may be adjusted from year to year to reflect changes due to inflation. The following is the methodology used to calculate a theoretical nursing rate for each casemix category in each NHRA....[4]

*See* Affidavit of Maureen Pompeo, Exhibit B at 18. Defendants' position is that this statement of the ratesetting process is enough, and that "[m]atters of empirical application such as the actual ranges do not rise to the level of law or agency operation required to be included in the plan." (Defendants' memorandum in opposition at 16).

To answer the question of whether the management minute ranges are a "method or standard," it is necessary to examine the language of the regulations, and the purposes behind the Medicaid Act's requirement that states submit their plans to HCFA. The state plan is defined by regulation as follows:

The State plan is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity

---

4. The plan goes on to set forth a complicated regression formula with which to arrive at the theoretical rate.

with the specific requirements of title XIX, the regulations in this Chapter IV, and other applicable official issuances of the Department. The State plan contains all information necessary for HCFA to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program.

42 C.F.R. § 430.10 (1990); *see Wilder v. Virginia Hosp. Ass'n,* — U.S. ——, 110 S.Ct. 2510, 2514, 110 L.Ed.2d 455 (1990). Thus, the question is whether a "comprehensive" state plan should include the management minute ranges as one of the "methods or standards for setting payment rates."

There is a lack of caselaw addressing the issue of comprehensiveness or what constitutes a "method or standard." The most instructive decision on this issue is the recent decision of *Folden v. Washington State Department of Social & Health Services. See* 744 F.Supp. at 1530. In *Folden,* plaintiffs attacked the state's practice of making a final settlement at the lower of the facility's audited allowable costs or its reimbursement rates. *Id.* at 1530. One of plaintiffs' arguments at trial was that the plan was deficient and insufficiently comprehensive because it failed to include this settlement principle. *Id.* The court in *Folden* illuminated the meaning of "comprehensive," explaining that

> the purpose of the requirement of comprehensiveness is to enable HCFA to decide whether to approve the Plan. In other words, the comprehensiveness of the Plan needs to be measured not in terms of how a lay person or how a provider would look at comprehensiveness, but rather how HCFA looks at comprehensiveness. HCFA has been satisfied with the comprehensiveness of the Plans throughout the relevant period.

*Id.* In sum, HCFA's satisfaction with the comprehensiveness of the state plan lead the court in *Folden* to conclude that it was not necessary for the plan to include the settlement principle.[5]

Likewise, HCFA's approval of 90–07, which did not contain the management ranges at issue, leads this Court to conclude that the management minute ranges are not a necessary component of Massachusetts' plan and thus, are not a "method or standard." The HCFA certainly has more expertise in this complicated area of the law than the courts. *Nebraska Health Care Ass'n v. Dunning,* 778 F.2d 1291, 1295 (8th Cir.1985), *cert. denied,* 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987). Consequently, as a general rule, HCFA approval of a state plan indicates state compliance with applicable statutes and regulations. *Illinois Council on Long Term Care v. Bradley,* 759 F.Supp. 1309, 1311 (N.D.Ill.1991); *Folden,* 744 F.Supp. at 1530; State Medicaid Manual § 6003 reprinted in 3 Medicaid & Medicaid Guide (CCH) ¶ 14,725; *see Colorado Health Care Ass'n,* 842 F.2d at 1169 n. 9 ("If such a change in patient population and concomitant needs should be specifically addressed in a state's reimbursement rate, then the Secretary is the one to so determine."). Had the HCFA found that 90–07 lacked comprehensiveness, or that the management minute ranges were a "method or standard" within the meaning of federal regulations, it could have withheld approval of that plan and required Massachusetts to include the management minute ranges in the plan. Thus, HCFA's approval of 90–07 despite the lack of management minute ranges indicates that, as a matter of law, the management minute ranges are not a "method or standard" for setting payment rates and the plan need not include such ranges in order to be comprehensive.[6]

Moreover, the term "method or standard" as used in the federal regulations is broad in meaning, reinforcing the conclusion that it does not encompass the actual

---

5. Additionally, the court in *Folden* relied on the fact that the plan incorporated by reference a state statute which included the settlement principle. *Id.*

6. The most recent state plan amendment is currently under review by the HCFA. This fact does not affect this Court's determination that by approving 90–07, HCFA implicitly found that a plan that does not contain the management minute ranges is comprehensive.

management minute ranges. Put another way, the "method or standard" that must be included in the plan is the method of using management minutes, not the actual management minute ranges themselves. That "method and standard" is broader in meaning than plaintiffs suggest can be seen first through the language of 42 C.F.R. § 420.10 (1990). In describing the comprehensiveness of the plan, that regulation explains that the plan must describe "the nature and scope" of the state's Medicaid program. 42 C.F.R. § 430.10 (1990). Similarly, the Supreme Court implicitly adopted a broad meaning of the word "method," stating that "Congress gave States leeway in adopting a method of computing rates—they can choose between retrospective and prospective rate-setting methodologies, for example—...." *Wilder*, 110 S.Ct. at 2520. Thus, the broad meaning of the term "method and standard" supports defendants' position that the management minute ranges themselves are not a necessary part of the state plan.

An examination of the purpose of the state plan and of HCFA review further supports this conclusion. Congress intended to reduce federal oversight of state Medicaid programs when it enacted the Boren amendment. *Wisconsin Hosp. Ass'n v. Reivitz*, 733 F.2d 1226, 1230 (7th Cir.1984) (quoting *Coalition of Michigan Nursing Homes, Inc. v. Dempsey*, 537 F.Supp. 451 (E.D.Mich.1982)). For example, although a state must submit assurances to HCFA, based on findings made by the state, that its plan complies with federal requirements, it need not submit its actual findings nor the underlying data to the HCFA. *Wilder*, 110 S.Ct. at 2516; *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306, 1313 (2d Cir.1991). This reduced federal oversight reflects the congressional intent not to overburden the states with cumbersome and excessive paperwork requirements. *Colorado Health Care Ass'n*, 842 F.2d at 1166 & 1167 n. 8; *Bethany Medical Ctr. v. Harder*, 641 F.Supp. 214, 218 (D.Kan.1986) (quoting 126 Cong.Rec. S8257 (daily ed. June 26, 1980)). Likewise, "HCFA's review is not directed to reviewing or accepting a state's payment methods and standards from a technical standpoint." State Medicaid Manual § 6003 reprinted in 3 Medicaid and Medicaid Guide (CCH) ¶ 14,725. This being the case, it would not make sense to require that the plan include information, namely the management minute ranges, that will not help the HCFA in its review. Moreover, this lessened federal scrutiny of state plans reflects the congressional desire that states have a great deal of flexibility in developing rate-setting methodologies and in deciding what factors to take into consideration. *Baliles*, 868 F.2d at 659. When viewed against the background of this congressional intent to reduce paperwork and federal oversight, it follows that states should not be required to include in their plan the management minute ranges which reflect empirical data.

Significantly, one of plaintiffs' own affidavits suggests that the proper place for the management minute ranges is not in the state plan, but in state regulations. In his affidavit, Scott Plumb, the director of government relations for the Massachusetts Federation of Nursing Homes, refers to the Federation's testimony at a RSC public hearing concerning the change in management minute ranges. At that hearing, the Federation testified that

[s]ince the billing categories are a fundamental part of the total reimbursement system, *we believe that they should be specified in rate setting regulations* to deter inappropriate manipulation of the categories for fiscal reasons. In addition, *their inclusion in regulations* would subject category determination to the same public hearing scrutiny that other important reimbursement regulations must face....

Affidavit of Scott Plumb at ¶ 5 (emphasis added). This Court agrees that the ranges belong in state regulations, not in the state Medicaid plan. The question of whether defendants complied with state law in changing the regulations is not one to be answered by this Court.

Having determined that the management minute ranges are not a "method or standard" that must be included in the state

plan, this Court now turns to plaintiffs' contention that defendants violated the plan in February, 1991, by using one set of acuity data for payment purposes, and a different set of acuity data for calculating the theoretical rates. Nowhere does the plan specify that the same data will be used for both payment and theoretical rate calculation purposes. Thus, on a very basic level, the use of two different sets of data cannot be said to violate the state plan as approved by HCFA, and therefore, does not violate the procedural requirements of federal Medicaid law.

For purposes of their motion for a preliminary injunction, plaintiffs have not argued that the use of acuity data from two different years violates the substantive mandate of the Boren amendment that rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." *See* 42 U.S.C. § 1396a(a)(13)(A) (1983 & Supp.1991). Even assuming they had so argued, there is insufficient information before this Court to meet plaintiffs' burden of demonstrating a likelihood of success that there has been a substantive violation of the Boren amendment. Plaintiffs submitted the affidavit of Scott Plumb to demonstrate that using 1989 data for both payment and theoretical rate purposes would have resulted in an increase in overall rates. Affidavit of Scott Plumb at ¶ 12.D. Even if it would be preferable or logical to use acuity data from the same year, however, the most Plumb suggests is that the use of the same data would increase payments; Plumb does not suggest that the current rate is insufficient "to meet the costs which must be incurred by efficiently and economically operated facilities." *See* 42 U.S.C. § 1396a(a)(13)(A) (1983 & Supp.1991). Moreover, it is well-settled that the existence of one inadequate component does not invalidate a scheme that produces a rate that is adequate overall. *See Colorado Health Care Ass'n,* 842 F.2d at 1167. Supposing Massachusetts' plan did specify that two different years'

acuity data would be used, a court could not invalidate that plan on the basis of the use of two different years if the resultant rate met Boren's substantive requirements.

Nor do the affidavits submitted by plaintiffs of Sharon E. Meyers (administrator of Amherst Nursing Home), Leighton S. Cheney (Administrator of Baldwinville) or Mark R. Ellsworth (Administrator of Westfield Manor), meet plaintiffs' burden. These brief affidavits compare the January and February rates in isolation, focusing on the difference between the January and February payments. It is well-settled, however, that rates must fall within a zone of reasonableness; therefore, the fact that the January rate was found to be reasonable does not make it the only reasonable rate possible. *See Reivitz,* 733 F.2d at 1233. As pointed out by defendant, these affiants fail to "challenge the substantive adequacy of those rates" under the Boren standard. The affiants' reference to layoffs and pay reductions are insufficient to carry their burden of demonstrating a likelihood of success on their substantive claim under the Boren amendment that they have undergone layoffs despite being efficient and economical. In sum, therefore, this Court concludes that plaintiffs have not demonstrated a likelihood of success on the merits.[7] Given this Court's determination that the plaintiffs are not likely to succeed on the merits of their federal claims, it is unnecessary to examine the remaining three requirements for a preliminary injunction, as each of the four elements must be satisfied. *See Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency,* 649 F.2d 71, 74 (1st Cir. 1981).

For all of the reasons stated above, the plaintiffs' motion for a preliminary injunction should be denied.

---

**7.** This Court makes no determination regarding plaintiffs' likelihood of success on its state

claims as those claims must be dismissed.