**OKLAHOMA NURSING HOME ASSOCI-ATION, Ambassador Manor South, Hillcrest Manor, Mooreland Golden Age Home, Oaks Healthcare Center, Sunset Estates of Watonga, and Valliant Care Center, Plaintiffs,**

v.

**Benjamin DEMPS, Jr., Director of the Oklahoma Department of Human Services, and John Orr, Chairman of the Commission for Human Services, Oklahoma Department of Human Services, Defendants.**

No. CIV–91–1282–R.

United States District Court,
W.D. of Oklahoma.

Dec. 9, 1992.

Joseph W. Metro, Washington, DC, Richard A. Mildren, Chapel Riggs Abney Neal & Turpen, Oklahoma City, OK, Joel M. Hamme, Reed Smith Shaw & McClay, Washington, DC, for plaintiffs.

John G. Fears, Dept. of Human Services Gen. Counsel/Legal Div., Oklahoma City, OK, for defendants.

## ORDER

DAVID L. RUSSELL, District Judge.

Before the Court are the Defendants' second Motion to Dismiss, the Plaintiffs' Motion for Summary Judgment, the Defendants' Motion to Strike, the Defendants' Motion to Reconsider, and the Defendants' Objection to the Magistrate's ruling on discovery. The Court held an evidentiary hearing and oral argument on the Defendants' Motion to Dismiss on November 6, 1992, at which the parties appeared by their respective counsel.

### I. Facts

The evidence is largely undisputed. Plaintiff Oklahoma Nursing Home Association ("ONHA") is an association representing approximately ninety three percent of all nursing homes in the state of Oklahoma with respect to various matters, including matters concerning the Oklahoma Medicaid reimbursement program. Plaintiffs, Ambassador Manor, Mooreland Golden Age Home, Oaks Healthcare Center, Sunset Estates of Watonga, and Valliant Care Center are long-term care nursing facilities certified for participation in Oklahoma's Medicaid program.

Defendant Benjamin Demps, Jr. is the Director of the Oklahoma Department of Human Services, which is the state agency designated pursuant to Title 42 U.S.C. § 1396a(a)(5) to administer the Oklahoma Medicaid program, and the agency which reimburses nursing facilities for their services to Medicaid beneficiaries. Defendant John Orr is the Chairman of the Commission for Human Services, which Commission is responsible for giving final approval to Med-

icaid reimbursement rates for nursing facilities.

The State of Oklahoma offers a Medicaid program, and has received federal matching funds to partially offset the cost of nursing facility services provided to eligible recipients under the Medicaid program. The "methods and standards" by which the State of Oklahoma has established reimbursement rates for nursing facilities are printed in Attachment 4.19–D to the Oklahoma state Medicaid Plan.

In setting Oklahoma's annual Medicaid reimbursement rates for nursing facilities, staff members of the Department of Human Services Medical Services Division ("Medical Services Division") first prepare "issue briefs" containing nursing facility rate recommendations. Those issue briefs are then provided to the Department of Human Services Committee on Rates and Standards ("Committee"), which holds public meetings and receives comments from interested parties with respect to Medicaid reimbursement rates. The Committee then makes rate recommendations to the Director of the Department of Human Services, who in turn makes rate recommendations to the Human Services Commission. The Human Services Commission also holds public meetings, and entertains comments from interested parties. The Human Services Commission then makes the final decision on Medicaid reimbursement rates.

The Department of Human Services does not identify specific nursing facilities as economically or efficiently operated, and has not adopted any objective criteria for determining what costs such a facility must incur. Instead, the Department conducts a "desk audit" each year to determine, on a retroactive basis, how each participating nursing facility's per diem costs compare with the Medicaid per diem reimbursement rates. The Department of Human Services makes no further inquiry to determine whether any nursing facilities with costs greater than the reimbursement rates are efficiently and economically operated.

The fiscal year 1991 Medicaid reimbursement rate for nursing homes was raised in March, 1991, at the recommendation of the Medical Services Division, to offset a scheduled increase in the federal minimum wage.[1] This interim rate increase was prorated and paid over a three month period from April through June, 1991.

On March 12, 1991, the Medical Services Division recommended a reimbursement rate of $47.40 per patient per day for fiscal year 1992, representing an increase of $3.50 over the fiscal year 1991 rate of $43.90 per patient per day in effect prior to the interim increase.[2] The $3.50 increase recommendation was comprised of a proposed $1.50 wage enhancement component, and a $2.00 adjustment designed to offset inflation ($1.70) and other factors ($.30).[3] The inflation compo-

1. For the first eight months of fiscal year 1991, (July 1, 1990 through February 28, 1991), the Medicaid reimbursement rate had been $43.90 per patient/day; this rate included an amount designed to accommodate the April 1, 1990 federal minimum wage increase from $3.35 per hour to $3.80 per hour. On March 12, 1991, the Medical Services Division recommended that the Committee on Rates and Standards propose a $1.50 per patient day increase in the reimbursement rate to offset the April 1, 1991 minimum wage increase from $3.80 per hour to $4.25 per hour, and to offset the "ripple effect" of anticipated wage increases for nursing facility employees earning above the minimum wage. Because it was unlikely that the rate increase could be approved and implemented before the minimum wage increase became effective, the Division further recommended that the rate increase be prorated to $2.01 per patient/day, and paid over the three month period from April through June, 1991. The Committee on Rates and Standards

approved the recommended rate increase, and the proration recommendation, at its March 14, 1991 meeting.

2. The Medical Services Division recommended that the Committee on Rates and Standards propose a $47.40 per patient day Medicaid reimbursement rate for fiscal year 1992. This proposed rate represented a $3.50 per patient/day increase over the $43.90 rate which was in effect prior to the prorated, three month interim rate increase of $2.01.

3. To arrive at the $1.70 inflation component of the proposed $3.50 rate increase, the Medical Services Division added the estimated fiscal year 1992 per diem costs for capital, personnel, and non-personnel operating costs, then subtracted the Medicaid reimbursement rate in effect for most of fiscal year 1991. To estimate the fiscal year 1992 personnel costs, the Division added the average daily per patient wage costs ($28.19),

nent of the rate increase proposal was based upon fiscal year 1990 cost data, which contained only three months of wage data reflecting the costs of the April 1, 1990 federal minimum wage increase. The Medical Services Division made no further adjustment to the fiscal year 1990 wage costs to annualize the effects of the minimum wage increase when it estimated the fiscal year 1990 personnel costs. On March 14, 1991, the Committee on Rates and Standards recommended adoption of a $47.40 Medicaid reimbursement rate for nursing facilities for fiscal year 1992.

At a March 25, 1991 Human Services Commission meeting, the Chairman of the Committee on Rates and Standards, Mr. Winston Barton, acting on behalf of Defendant Demps, recommended that the Human Services Commission approve the interim rate increase for the remainder of fiscal year 1991, and defer action on the proposed rate increase for fiscal year 1992 until the Oklahoma legislature had completed its fiscal year 1992 appropriation. At the Human Services Commission meetings on April 22, 1991 and May 20, 1991, Mr. Barton recommended that the Commission continue to defer action on the fiscal year 1992 Medicaid rate until the state legislature had completed its fiscal year 1992 appropriation. Consistent with Mr. Barton's recommendation, the Commission took no action on the fiscal year 1992 rate at those meetings.

In late April or early May, 1991, State Senator Bernest Cain of the Oklahoma legislature advised Mr. Barton that the monies necessary to fund the recommended $3.50 rate per patient/day increase might not be available. In early May, 1991, Mr. Barton examined a legislative appropriations committee's recommended appropriation and

staff reports. Mr. Barton interpreted those reports as indicating that the legislature intended to fund a $2.50 rate increase for fiscal year 1992. Mr. Barton believed the legislative committee's report was entitled to some deference. On May 30, 1991, the Governor of Oklahoma signed the Department of Human Services fiscal year 1992 appropriation.

After the legislative appropriation was complete, Mr. Barton asked the Programs Administrator of the Medical Services Division to have Medical Services Division staff prepare written documentation to support a $46.40 Medicaid reimbursement rate for fiscal year 1992, an increase of $2.50. A Medical Services Division staff member then prepared and submitted to Mr. Barton an "issue brief" supporting a $46.40 Medicaid reimbursement rate ($2.50 increase) for nursing facilities for fiscal year 1992. The Committee on Rates and Standards did not review, discuss or approve the "issue brief" supporting the $46.40 rate or the $46.40 rate itself. The Committee did not hold any public meetings with respect to the $46.40 "issue brief," or with respect to the assumptions used in that issue brief to justify the $46.40 rate, $2.50 rate increase. The $46.40 issue brief assumed a much smaller increase in personnel costs resulting from the April 1, 1991 federal minimum wage increase than had the earlier issue brief recommending a $47.40 rate, $3.50 increase.[4]

At its June 11, 1991 meeting, the Human Services Commission was not provided with the $46.40 rate, $2.50 increase issue brief prepared by Medical Services Division staff. At the meeting, Mr. Barton presented to the Commission a chart entitled "Oklahoma DHS Proposed Rate Increases for FY 1992." Mr. Barton recommended, and the Commission

and fringe benefit costs ($3.38) from the fiscal year 1990 nursing facility cost reports; added a 6.2% inflation factor to account for inflation during fiscal year 1991 ($1.39); added an amount to reflect increased staffing costs required by the Omnibus Budget Reconciliation Act of 1987 ($2.54); and applied a 6.7% inflation factor to account for inflation during fiscal year 1992. The Defendants maintain that the various amounts taken into account in recommending and adopting a rate are not "components" of the rate in the sense of being earmarked for certain categories of costs, as they are in some states.

The so-called "components" are merely the state's working estimates of certain projected costs, rather than categorical allotments.

4. The issue brief supporting a $2.50 increase, or a $46.40 per patient day reimbursement rate, provided for an increase of $.92 to offset the direct and indirect ("ripple") effects of the April 1, 1991 federal minimum wage increase, as compared with an increase of $1.50 which had been approved for fiscal year 1991.

approved a fiscal year 1992 Medicaid reimbursement rate for nursing facilities of $46.40 per patient/day at that meeting. Before establishing the fiscal year 1992 Medicaid reimbursement rate for nursing facilities, the Defendants and the Human Services Commission did not consult with or seek input from the Medical Care Advisory Committee.

The state's "methods and standards" for establishing Medicaid reimbursement rates for nursing facilities are substantially similar to the methods and standards used to establish rates for intermediate care facilities for the mentally retarded. The fiscal year 1992 Medicaid reimbursement rate for intermediate care facilities for the mentally retarded was based upon calculations which annualized the costs attributable to the April 1, 1990 minimum wage increase; the fiscal year 1992 reimbursement rate for nursing facilities made no provision for annualizing such costs. The reimbursement rate for intermediate care facilities for the mentally retarded also included a much larger figure for wage enhancement to account for costs attributable to the April 1, 1991 minimum wage increase.[5]

On June 27, 1991, the Oklahoma State Board for Property and Casualty Rates approved a proposal allowing private workers' compensation insurance carriers to raise their premiums by approximately 35% effective July 1, 1991. Plaintiff Oklahoma Nursing Home Association petitioned the Human Services Commission to convene a public hearing to determine whether the workers' compensation premium increase warranted a Medicaid reimbursement rate adjustment. Defendants failed to convene such a hearing, and further failed to conduct an analysis to determine the cost impact of the workers' compensation premium increase upon nursing facilities.

Fiscal year 1992 ended on June 30, 1992. The Defendants contend that there are no outstanding claims owing to nursing facilities for services rendered in fiscal year 1992. The Plaintiffs do not offer evidence of any specific claims or amounts owing for fiscal year 1992; Plaintiffs contend that because there are ongoing eligibility disputes, there must be amounts owing for claims several months old at any given time.

## II. Associational Standing

The Defendants, citing *Kansas Health Care Ass'n v. Kansas Dep't of Social Services*, 958 F.2d 1018 (10th Cir.1992), assert lack of standing on the part of Plaintiff Oklahoma Nursing Home Association. In that case the Tenth Circuit held that two health care associations, suing as representatives of their members, did not have standing to assert procedural and substantive violations of the Boren Amendment because proof and resolution of the claims asserted would, under the circumstances, require the individual participation of the associations' members. The Plaintiffs in that case were attempting to challenge a rate freeze imposed on Kansas' facility-specific Medicaid rates. In this case, the Plaintiffs, which include six nursing facilities as well as the Plaintiff association, challenge only the procedure by which Oklahoma's statewide rates are set. The particular procedural claims asserted do not require inquiry into the operations or costs of any individual members of the Plaintiff association.

The Court finds that the members of the Oklahoma Nursing Home Association would otherwise have standing to sue in their own right; that the interests the association asserts are germane to the association's purpose; and that neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. The Court holds, therefore, that Plaintiff Oklahoma Nursing Home Association has standing to sue on behalf of its members. *See Kansas Health Care Association v. Kansas Dept. of Social Services*, 958 F.2d 1018

---

**5.** The fiscal year 1992 reimbursement rate for mentally retarded care facilities included a $2.00 per patient/day increase to account for the April 1, 1991 minimum wage increase; the reimbursement rate for nursing facilities included a $.92 per patient/day increase to offset the same minimum wage increase. The mentally retarded care facility $2.00 wage enhancement was calculated in the same manner which was used to arrive at the initial proposal for nursing facilities, which proposal was rejected. Under the rejected proposal, nursing facilities would have received a $3.50 per patient/day rate increase, $1.50 of which was attributable to the April 1, 1991 minimum wage increase.

(10th Cir.1992), *citing Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

### III. Defendants' Eleventh Amendment Jurisdictional Challenge

 Defendants move to dismiss the Plaintiffs' claims on Eleventh Amendment grounds, arguing that because fiscal year 1992 has ended, any relief Plaintiffs could recover is necessarily retrospective in nature. Both sides agree that the Eleventh Amendment deprives federal courts of jurisdiction to adjudicate claims for retrospective, monetary relief from a state governmental entity, and claims for declaratory relief which would have the same effect. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Claims for purely prospective, injunctive relief may be adjudicated without running afoul of the Eleventh Amendment. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

### A. *Possible Outstanding Claims*

Plaintiffs offer affidavits averring that the Defendant state officials have not received or paid all Medicaid reimbursement claims for fiscal year 1992. The Affidavits do not identify specific claims by provider, date or amount. Plaintiffs' evidence shows, at best, that some claims for services rendered by some unidentified providers in fiscal year 1992 may not have been submitted. Such claims may be submitted as late as one year after the service is provided. Plaintiffs have shown further that there are ongoing eligibility disputes, so that at any given time it is likely that there are unpaid claims several months old. The Plaintiffs have not identified any specific claims owing to the six named Plaintiff nursing facilities, or to any members of the Plaintiff Association. The Defendants have offered affidavits averring that all submitted claims for fiscal year 1992 have been reimbursed or otherwise resolved.

 The Eleventh Amendment prohibits awarding injunctive relief for past injuries ("retroactive" relief) if the relief would require expenditures from a state treasury. In determining on which side of the prospective/retroactive line a claim for relief falls,

courts generally have focused upon the time at which the injuries occurred. *Rye Psychiatric Hospital Center, Inc. v. Surles,* 777 F.Supp. 1142, 1147 (S.D.N.Y.1991), *citing Port Chester Nursing Home v. Axelrod,* 732 F.Supp. 440, 444 (S.D.N.Y.1990); *Friedman v. Perales,* 616 F.Supp. 1363, 1369 (S.D.N.Y. 1985). *See also West Virginia University Hospitals, Inc. v. Casey,* 701 F.Supp. 496, 523 (M.D.Pa.1988), *aff'd in part, rev'd in part,* 885 F.2d 11 (3d Cir.1989) (reversed in part on other grounds), *cert. denied,* 496 U.S. 936, 110 S.Ct. 3213, 110 L.Ed.2d 661 (1990). If relief is sought for past harms, it must be considered retroactive; if the harms alleged may be considered present harms, injunctive relief may be granted to remedy any further harm. *Rye Psychiatric Hospital Center, Inc. v. Surles,* 777 F.Supp. 1142 (S.D.N.Y. 1991).

 Some courts in similar circumstances have reasoned that any injuries a participating nursing home may have sustained would have occurred at the time the nursing home was reimbursed according to rates legally improper under the Boren Amendment. *Rye, supra.* Any relief which a plaintiff nursing facility might be granted would be prospective with respect to any reimbursement claims remaining unpaid at that time, because the injury will have arisen after the court reaches its decision. *Rye Psychiatric Hospital Center, Inc. v. Surles,* 777 F.Supp. 1142 (S.D.N.Y.1991).

The evidence before the Court at this stage shows merely that there *may* be some fiscal year 1992 claims for reimbursement owing to some unidentified nursing homes, either pending or not yet submitted. The mere possibility of outstanding claims is insufficient to warrant injunctive relief, which would have the effect of requiring funds to be paid from the state treasury, as is the case with the Plaintiffs' request for an interim rate increase.

### B. *Continuing Violation Doctrine*

Plaintiffs also assert that the Defendants' conduct amounts to a "continuing violation" of the Boren Amendment. Plaintiffs claim that the Defendants employed the same chal-

lenged methodologies and procedures in adopting the fiscal year 1993 reimbursement rate. Defendants, on the other hand, assert that adoption of the fiscal year 1993 reimbursement rate was a completely separate process, and that the continuing violation doctrine does not apply. Defendants have submitted the Affidavit of James Igo of the Department of Human Services, which avers that in adopting the fiscal year 1993 rates, the Defendants used more recent data, including data which was not available when the 1992 rate was established. The Defendants' contention, then, is that the 1993 rate was set using different cost data than the 1992 rate.

The Defendants do not dispute the Plaintiffs' contention that in setting the 1993 rate, the Defendants utilized virtually all of the same challenged procedures. The Court has reviewed the written Methods and Standards for Establishing Payment Rates for Nursing Facilities as revised July 1, 1992 (for fiscal year 1993), submitted by the Defendants, and has compared it with the July 1, 1991 (for fiscal year 1992) version of the same document. (Ex. "B" to Plaintiff's Motion for Summary Judgment) The two versions are identical in all significant respects.[6] The State's Plan has not been amended so as to "specify comprehensively" the methods and standards employed in the rate setting process. Furthermore, the Defendants do not contend that they have made findings or assurances in support of its fiscal year 1993 rate in a different manner than that which the Court rejects, *infra*, for the 1992 rate. Although the inflation rates and other numbers have changed, the State's computation process remains the same.

■■ The "continuing violation" doctrine may be applied by courts in order to enjoin a continuing violation of law by state officials, where a plaintiff's claim would otherwise be

moot. *See, e.g., Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). In this case, it is clear that the Defendants have committed a violation of federal law, which violations continue unabated to this date.

IV. State's Obligation to Specify Comprehensively the Methods and Standards Used to Set Rates

■ The Plaintiffs seek summary judgment on their claim that the Oklahoma Methods and Standards for Establishing Payment Rates for Nursing Facilities does not comply with the requirement that it contain comprehensive methods and standards as to the manner in which Medicaid reimbursement rates are calculated. The Boren Amendment's implementing regulations require, inter alia, that state Medicaid plans must "specify comprehensively the methods and standards used by the agency to set payment rates...." 42 C.F.R. § 447.252(b).

Defendants respond first that the Plaintiffs failed to raise this claim in their Complaint, and that it should be rejected for this reason alone. The Complaint alleges in Paragraph 7 that "the FY 1992 Medicaid payment rate for NFs in Oklahoma does not meet federal requirements pertaining to establishment of such rates." In Paragraph 29(c), the Complaint alleges that "[r]ates must be determined in accordance with specified, comprehensive methods and standards (42 C.F.R. § 447.252(b))." The Court finds that the Complaint fairly places Defendants on notice of the Plaintiffs' claim of violation of Section 447.252(b).

Oklahoma's methods and standards for setting payment rates are promulgated in Attachment 4.19–D to the state's Medicaid Plan, in a document entitled "Methods and Standards for Establishing Payment Rates for Nursing Facilities."[7] The Methods and

---

6. The July 1, 1991, version includes the following language which was deleted from the current draft: "For Fiscal Year 1992, nursing facilities serving adult patients will receive an adjustment of $2.98 per patient day to cover the costs of complying with the above section of law."

7. The text of Attachment 4.19–D reads, in its entirety, as follows:

A statewide prospective rate of payment shall be computed at least annually for nursing facilities serving adult patients. The rates will be established by the Commission for Human Services upon receipt of recommendations from the Rates and Standards Committee composed of knowledgeable staff from DHS. The Commission shall take into consideration information obtained from public meetings, cost re-

Standards document specifies that the state's reimbursement rate for nursing facilities will be statewide and prospective, and will be computed "at least annually." [8] The rate-setting agency, the Human Services Commission, is directed to take into account "information obtained from public meetings, cost reports and negotiations with recognized representatives of the nursing home industry." The Commission is directed to consider "[r]ecognized economic factors", including "noted trends in national and state Consumer Price Indices and factors such as prevailing salary levels of health care professionals and changes in the law governing minimum wage levels." No guidance is given with respect to how those economic factors will be "considered".

Aside from establishing how often and by whom rates will be set, Oklahoma's Methods and Standards document adds nothing of substance, but merely restates the Boren Amendment's requirement that the state's Medicaid Plan "take into account the costs ... of services necessary to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident," [9] and that the State's reimbursement rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." [10]

Defendants argue that because the State Plan has been approved by the governing federal agency, the Health Care Financing Administration, it is therefore sufficiently comprehensive. Defendants would have the Court interpret Section 447.252(b) as requiring only that the state's Medicaid Plan "specify [rate-setting methodology] comprehensively" enough to enable the federal Health Care Financing Administration ("HCFA") to pass upon the Plan. The Defendants argue that while Section 447.252(b) requires that a state's Medicaid plan must "specify comprehensively the methods and standards used by the agency to set payment rates," a companion regulation provides that "[t]he State plan [must] contain[] all information necessary for HCFA to determine whether the plan can be approved as a basis for Federal financial participation ... in the State program." Defendants' Memorandum, p. 22, *citing* 42 C.F.R. § 430.10.

The Court does not read Section 430.10 as limiting the obligations imposed by Section 447.225(b). Section 430.10's requirement that a state's plan must contain the information necessary to enable HCFA to approve the plan does not abrogate a state's duty under Section 447.225 to "specify comprehensively the methods and standards used ... to set payment rates...." When the comprehensive methods and standards requirement of Section 447.252(b) was promulgated, the Department of Health and Human Services explained that the provision was intended to ensure that "*all parties* subject to the reimbursement rate understand which items and services are paid for through the rates." 48 Fed.Reg. 56,046 at 56,049 (Dec. 19, 1983) (emphasis added). The regulatory scheme as

ports and negotiations with recognized representatives of the nursing home industry. The payment rates will be set at the level which DHS finds adequate to reimburse the cost of a facility which is economically and efficiently operated. Recognized economic factors will be included in the determination of the prospective rates. Such consideration shall include noted trends in national and state Consumer Price Indices and factors such as prevailing salary levels of health care professionals and changes in the law governing minimum wage levels. The rates will take into account the costs of complying with subsections (b) including the costs of services required to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident eligible for benefits under Title XIX (other than paragraph (3)(F) thereof), (c), and (d) of section 1919 and provide (in the case of a nursing facility with a waiver under section 1919(b)(4)(C)(ii)) for an appropriate reduction to take into account the lower costs (if any) of the facility for nursing care. For Fiscal Year 1992, nursing facilities serving adult patients will receive an adjustment of $2.98 per patient day to cover the costs of complying with the above sections of law.

Uniform cost reports will be required of such nursing facilities and the State will provide for periodic audits of such reports.

8. The provision that rates be computed at least annually adds nothing to the requirement imposed by 42 C.F.R. § 447.253(b) that findings be made "not less often than annually."

9. Title 42 U.S.C. § 1396a(a)(13)(A).

10. *Id.*

a whole clearly implies that the comprehensiveness requirement of Section 447.225 is not solely for the benefit of the Department of Health and Human Services or its agency, the HCFA.

Defendants cite *Folden v. Washington State Department of Social and Health Services,* 744 F.Supp. 1507 (W.D.Wash.1990), *appeal pending,* Nos. 90–35397 and 90–35475 (9th Cir. ); and *Massachusetts Federation of Nursing Homes v. Massachusetts,* 772 F.Supp. 31 (D.Mass.1991) for the proposition that a state plan need only satisfy HCFA in order to meet the requirements of specificity and comprehensiveness imposed by Section 447.252(b). In *Folden, supra,* the plaintiffs challenged the state's "settlement principal," the practice of making final payment at the lower of the nursing facility's actual allowable costs or the state's predetermined reimbursement rates. The Plaintiffs argued that the state's plan was not sufficiently comprehensive because it failed to include this "settlement principal." The district court in holding that the plan was sufficiently comprehensive, reasoned that:

> The purpose of the requirement of comprehensiveness is to enable HCFA to decide whether to approve the Plan. In other words, the comprehensiveness of the Plan needs to be measured not in terms of how a lay person or how a provider would look at comprehensiveness, but rather how HCFA looks at comprehensiveness.

744 F.Supp. at 1530. The court then noted that HCFA had been satisfied with the comprehensiveness of the plan throughout the relevant period. *Id.* The *Folden* court's conclusion that the Washington plan was sufficiently comprehensive was also based, at least in part, upon the fact that the so-called "settlement principal" which was not specifically spelled out in the plan was incorporated into the plan by reference.

In *Massachusetts Federation of Nursing Homes, supra,* the state had used a variable reimbursement rate based upon what the state called "management minutes." Under the Massachusetts plan, "management minutes" were assigned to nursing facilities depending upon the level of care required by their patients. When the state changed the management minutes used to set reimbursement rates, the providers sued, claiming that the actual management minute ranges should be specifically spelled out in the state plan. The district court concluded that although the *concept* of using management minutes was a "method or standard" required to be specified in the plan, the actual ranges of management minutes were not "method[s] or standard[s]," and thus were not required to be specified comprehensively in the plan. The court reasoned that:

> ... HCFA's approval of [the state plan], which did not contain the management ranges at issue, leads the court to conclude that the management minute ranges are not a necessary component of Massachusetts' plan and thus, are not a 'method or standard.' .... The HCFA certainly has more expertise in this complicated area of law than the courts. Consequently, *as a general rule,* HCFA approval of a state plan indicates state compliance with applicable statute and regulations.

772 F.Supp. at 39 (citations omitted, emphasis added).

While the *Folden* and *Massachusetts Federation* courts did place some reliance upon the fact that the plans under attack had HCFA approval, the courts did not limit their inquiry to the presence or absence of HCFA approval. The courts did not suggest that HCFA approval necessarily should preclude an inquiry into whether a state's plan met the requirements of Section 447.252(b). As a "general rule," HCFA approval is merely some indication that a state's plan complies with applicable statutes and regulations. HCFA approval, then, is at least a factor to be considered in determining whether a plan is sufficiently comprehensive, and at most, a rebuttable presumption, which can be overcome in the case of a state plan which clearly violates the federal Medicaid statutes or their implementing regulations. *Accord, AMISUB (PSL) v. State of Colorado Dept. of Social Services,* 879 F.2d 789 (10th Cir. 1989) (holding that HCFA approval of a Medicaid plan does not establish that the state has met its minimum requirements).

Oklahoma's Plan stands in stark contrast to those of some other states which this

Court has examined.[11] Oklahoma's "Methods and Standards" document does not impose or even suggest any particular mathematical formula; it gives no indication of how the rates are actually computed. The provision that the plan must "specify comprehensively the methods and standards used ... to set payment rates" does not necessarily mean that a plan must include a precise mathematical formula; theoretically a plan might pass muster without specifying a mathematical formula if it is both specific and comprehensive in its description of the ratesetting methods and standards. The Oklahoma Plan, however, contains nothing which could reasonably be expected to inform the reader of the "methods" used to set the rate; and certainly does not satisfy the requirement that the plan "specify comprehensively the methods" used to set the rate. In practice, Oklahoma sets its rates based on inflation-adjusted historical cost data, yet the state's Plan makes no attempt to specify which historical costs are allowable and which are not allowable. The plain meaning of the term "specify comprehensively" implies both some degree of detail and some sense of thoroughness or completeness in the description of the methods and standards used to set the rates. The Court finds, as a matter of law, that Oklahoma's methods and standards for setting reimbursement rates for nursing facilities, are not specified com-

prehensively in Attachment 4.19–D to the state's Plan.

## V. State's Duty to Make Adequate Findings and Assurances

Plaintiffs next seek summary judgment on their claim that the Defendants failed to identify efficiently and economically operated nursing facilities prior to adopting the fiscal year 1992 reimbursement rate. The Plaintiffs argue that because the Defendants have failed to identify specific nursing facilities as "efficiently and economically operated," they have failed to comply with the Boren Amendment's requirement that the state make findings and assurances satisfactory to the HCFA that its Medicaid reimbursement rates are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities. *See* Title 42 U.S.C. § 1396a(a)(13)(A). The Defendants argue, in turn, that the state's Plan "implicitly" identifies efficiently and economically operated facilities as those whose costs are at or below the state's reimbursement rate.

### A. The State's Duty to Make Findings and Assurances

In *AMISUB (PSL) v. State of Colorado Dept. of Social Services*, 879 F.2d 789 (10th Cir.1989), the plaintiffs challenged Colorado's system for Medicaid reimbursement of inpa-

---

**11.** For example, the State of Washington has adopted a Plan which:

> explains how the rates are set substantively, explains various cost ceilings and limitations;
> —specifically identifies seven sources of information which may be used to set rates;
> —establishes a provider-specific rate scheme, rather than an "across the board" or state-wide rate;
> —specifies that rates are adjusted for inflation, and explains how such adjustment is to be made;
> —identifies allowable costs, albeit in rather broad terms;
> —establishes several different categories of reimbursable costs by cost area, such as nursing services, property costs, food costs, administrative and operating costs; "return on investment" allowance; and wage enhancement costs; and
> —imposes limits upon shifting of costs between cost areas.

The State of Massachusetts has adopted a plan which explains in great detail the mathematical

formulae used to compute its reimbursement rates, and the methods and standards for applying the formula. Arkansas' plan specifies in detail how the per diem reimbursement rates, including how the inflation factor will be determined, which costs are allowable and non-allowable, and how rates can be adjusted to accommodate unanticipated cost increases. Plans adopted by Colorado and New Mexico give specific formulae for computing reimbursement costs, and explain how historical cost data are treated. Louisiana's plan is brief, but specifies the mathematical formula for computing reimbursement costs. Texas has adopted a detailed case-mix system in its plan, assigning weighted costs based upon the time required to deliver direct care to the case-mix of patients residing in a facility. Texas' plan describes each of the rate components, and explains how rates are determined. Kansas operates under a facility-specific system. Its plan describes how rates are determined based on costs, and how retroactive adjustments are made. The Plan contains an explanation of the reimbursement formula.

tient hospital services. The district court granted judgment in favor of the defendants, holding that the findings of Colorado's Medicaid agency were not arbitrary and capricious. The Tenth Circuit reversed, holding that *if* the state agency had met the requirements of federal law, the federal courts would defer to the state agency's discretion unless the agency had acted arbitrarily or capriciously. 879 F.2d at 795. Before deferring to the state agency, courts must first inquire whether the state agency had satisfied the requirements of federal law. *Id.*

■ The Tenth Circuit in *AMISUB, supra,* interpreted the applicable provisions of the Boren Amendment as requiring the state Medicaid agency, at a minimum, to make findings which identify and determine: (1) efficiently and economically operated hospitals; (2) the costs which must be incurred by such hospitals; and (3) payment rates which are reasonable and adequate to meet the reasonable costs of such hospitals. *AMISUB,* 879 F.2d at 796. In other words, the state must make findings which establish a nexus between the costs of operating efficient and economic nursing facilities and the state's reimbursement rate. *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306 (2d Cir.1991), *citing AMISUB, supra,* 879 F.2d at 796. Consistency between the facilities' expenditures and the amount appropriated by the state legislature does not establish this nexus. *AMISUB,* 879 F.2d at 796, 797. Moreover, approval of the plan by the HCFA does not establish that the state has met the minimum requirements of the Boren Amendment. *Id.* Of course, the Tenth Circuit's decision in *AMISUB, supra,* dealt with hospital reimbursement rates, rather than reimbursement rates for long-term nursing facilities.

In the case of nursing facilities, the state's findings and assurances must take into account the costs of services required to maintain the highest practicable physical, mental, and psychosocial well-being of each resident eligible for Medicaid benefits. Title 42 U.S.C. § 1396a(a)(13)(A).

B. *The Findings and Assurances Made In Support of Oklahoma's Fiscal Year 1992 Rate*

■ In this case, the Defendants argue that they have made the required findings and assurances as defined by *AMISUB, supra,* because:

1. The state Department of Human Services "identifies" (and continues to identify) efficiently and economically operated nursing facilities as those which hold their costs below the rates which the Department has established;[12] and

2. Since the establishment of the fiscal year 1992 reimbursement rate, information has become available to the Department of Human Services, which indicates that the inflation rate assumptions used in arriving at the fiscal year 1992 rates were too high and thus the fiscal year 1992 rate is in fact "overly generous" to the nursing facilities.

Defendants' Memorandum at pp. 29–33.

The Defendants argue, in essence, that they have defined and identified efficiently and economically operated facilities as all of those which spend no more than the per patient/day rate which the state has fixed. According to the Defendants, any facility which can operate in fiscal year 1992 at a rate which was based on the average costs incurred statewide by all nursing facilities in fiscal year 1990 and adjusting upward to account for inflation and other factors, is implicitly found to be economically and efficiently operated. Any facility which incurs greater costs is necessarily not efficiently or economically operated.

---

**12.** The Defendants maintain that their fiscal year 1992 rate "represents a reasonable estimate of average industry per patient day costs," and that this estimate is "based on an objective determination that such a rate is adequate, if not more than adequate, to meet the costs that must be incurred by an efficiently and economically oper-

ated facility providing the legally requisite levels of care." Defendants posit that if a nursing facility is unable to operate at the costs of the average facility, the State is justified in concluding that it is incurring costs beyond those which must be incurred by efficiently and economically operated facilities.

The Defendants' argument is unavailing. First, the state cannot meet its obligations to identify efficiently and economically operated facilities by simply indulging in the assumption that any facility whose costs fall below the state's own reimbursement rate is efficiently and economically operated. Second, and perhaps more obviously, the state cannot define or identify the costs which such facilities must incur by indulging in the same assumption.

It seems readily apparent to the Court that a facility whose costs are lower than or equal to the state's reimbursement rate is not necessarily efficiently or economically operated; and even more apparent that such a facility is not necessarily providing the highest practicable level of physical, mental, and psychosocial well-being of each resident eligible for benefits, as required by the Boren Amendment. Conversely, a nursing facility which spends more than the per-patient reimbursement rate might be efficiently and economically operated. A facility's relationship to the "average" cost of operating a nursing facility says little or nothing about whether that facility is efficiently or economically operated, since all facilities within the state, as a practical matter, are constrained to keep their per-patient costs within the State's prospectively determined, statewide reimbursement rate. Put simply, states must fix rates based on the needs of an efficient and economical facility rather than determine the efficiency and economy of a facility based on whether it can operate within the state's rate.

Projecting the statewide average cost of operating a nursing facility falls far short of the State's obligation to identify efficiently and economically operated facilities. Likewise, the process of considering historical cost data and projected inflation figures is an appropriate part of its ratesetting process, but does not identify efficiently and economically operated facilities. *Accord, Illinois Health Care Ass'n v. Bradley*, 776 F.Supp. 411 (N.D.Ill.1991); *Multicare Medical Center v. Washington*, 768 F.Supp. 1349 (W.D.Wash. 1991).

The Defendants claim that they have identified the costs which efficiently and economically operated facilities must incur by reviewing the fiscal year 1990 cost data for every nursing facility within the state, analyzing those costs on a cost-center basis, and calculating the average actual costs of nursing facilities for fiscal year 1990, and adjusting for inflation. This, of course, is the same tautological approach the State proffered to identify economically and efficiently operated facilities; it clearly *does not define or identify* those costs which efficiently and economically operated nursing facilities must incur to provide the highest practicable level of physical, mental, and psychosocial well-being for each resident.

The Defendants have presented no evidence at all that it has found any nexus between its reimbursement rates and the costs of operating an efficient and economical facility providing the requisite level of care. *See Illinois Health Care Ass'n v. Bradley*, 776 F.Supp. 411, 418 (N.D.Ill.1991). While Oklahoma's reimbursement rate *may* represent the costs incurred by efficient and economical facilities, its rate-setting procedures would not enable it to make findings or assurances to that effect. Indeed, such a finding is not possible when the state has failed to identify an objective efficiency standard against which to compare its rates. *Illinois Health Care Ass'n v. Bradley*, 776 F.Supp. 411 (N.D.Ill.1991) (*citing Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306 (2d Cir. 1991); and *Temple University—of the Commonwealth System of Higher Education v. White*, 729 F.Supp. 1093 (E.D.Pa.1990), *aff'd*, 941 F.2d 201 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1991)).

■ Defendants also argue that since the fiscal year 1992 rate was established, state officials have gathered the following additional evidence tending to show that the fiscal year 1992 was substantively adequate:

1. Nursing facilities incurred some costs which were, on average, lower than those estimated for fiscal year 1991; for example, wage and salary costs are

actually less than projected when setting the fiscal year 1992 rate;[13]

2. Inflation has proven to be lower than the projected rate;

3. The quality of care and safety standards at nursing facilities remains high; and

4. The total number of beds in Oklahoma nursing facilities has increased during fiscal year 1992.

While these factors may have some bearing upon the substantive adequacy of the fiscal year 1992 rate, they do not tend to prove that the State met its procedural obligations under the Boren Amendments to the Medicaid Act. The State's compliance with the Boren Amendment procedural requirements must be judged by the facts which were available at the time the rates were set. *See California Hospital Ass'n v. Schweiker,* 559 F.Supp. 110, 116 (C.D.Cal.1982), *aff'd,* 705 F.2d 466 (9th Cir.1983). Any interpretation which allowed the State to justify its rate with nunc pro tunc findings in the middle of the fiscal year would be at odds with the regulatory requirement that prospective reimbursement rates be supported by findings and assurances made at least annually. 42 C.F.R. § 447.253(b).

The Court finds, as a matter of law, that in adopting the fiscal year 1992 Medicaid reimbursement rate, the State of Oklahoma failed to make the findings and assurances required by the Boren Amendment to the Medicaid Act.

### VI. Rate–Setting Based on Budgetary Concerns

The Plaintiffs next claim that the Defendants violated the Medicaid Act by setting the fiscal year 1992 rate based solely upon budgetary concerns. Defendants cite *Colorado Health Care Ass'n v. Colorado Dept. of Social Services,* 842 F.2d 1158 (10th Cir.1988) in support of their contention that "nothing in the Boren Amendment or its implementing regulations ... prevents a state from setting rates on the basis of budgetary consider-

ations." Defendants' Memorandum at 34. As the Tenth Circuit noted in *AMISUB, supra:*

> While *Colorado Health* does declare that a State Medicaid Agency may consider budgetary constraints, budgetary constraints cannot excuse noncompliance with federal Medicaid law. While *Colorado Health* allows the state to consider budgetary factors *as a factor* in amending Medicaid payments, consideration of budgetary factors alone does not translate to automatic compliance with the federally mandated findings that efficiently and economically operated hospitals are reasonably and adequately compensated for the costs which must be incurred. A "state must articulate 'a rational connection between the facts found and the choice made.'"

879 F.2d at 800 (citations omitted, emphasis in original). *See also Wisconsin Hospital Ass'n v. Reivitz,* 733 F.2d 1226, 1236 (7th Cir.1984); *Mississippi Hospital Ass'n v. Heckler,* 701 F.2d 511, 518 (5th Cir.1983).

The Plaintiffs' evidence in this case shows that after the State's Committee on Rates and Standards completed its study of projected costs for nursing facilities for fiscal year 1992, and prepared documentation recommending a fiscal year 1992 reimbursement rate of $47.40 per patient per day, the committee Chairman, Mr. Winston Barton, presented a different and lower proposed rate to the Human Services Commission to accommodate what he believed to be the intended legislative appropriation. The Committee chairman then requested documentation from Department of Human Services staff to support his predetermined figure. The revised documentation (the $46.40 issue brief) was not presented to the rate-setting agency, the Human Services Commission; instead the Commission was presented with a chart labeled "Oklahoma Department of Human Services Proposed Rate Increases for Fiscal 1992." The chart contains no backup data which would support a finding that the new

---

**13.** The Plaintiffs have offered into evidence the Affidavit of Bruce Thevenot, the Executive Director of the Oklahoma Nursing Home Association, in which the affiant expresses his belief that the nursing home industry's personnel costs for

fiscal year 1991 were lower than anticipated because many nursing facilities were unable to employ adequate numbers of nurses in fiscal year 1991 to comply with federal staffing mandates.

rate was adequate; it simply contains columns which compare the then-current rate, the first proposed rate for fiscal year 1992, the cost to the state of the first proposed rate, the legislative appropriation, and the "New [proposed] Rate." [14] One of the commissioners inquired whether the new proposed rate met the requirements of the Boren Amendment; Mr. Barton assured him that it did. The Commission then voted to adopt the "new rate" of $46.40 per patient per day for fiscal year 1992.

The Plaintiffs' evidence supports the inference that Mr. Barton, acting as Chairman of the Committee on Rates and Standards in recommending the fiscal year 1992 rate, and the Human Services Commission, acting as final ratesetting agency, were so greatly influenced by the Legislature's budgetary appropriation that any "findings" or "assurances" they made at the time were purely perfunctory. The Court need not find that the fiscal year 1992 rate was based solely upon budgetary concerns in order to conclude that the fiscal year 1992 rate of $46.40 per patient per day is not supported by appropriate findings and assurances as required by the Boren Amendment.

### VII. Duty to Consult Medical Care Advisory Committee

■ The Plaintiffs also complain that the Defendants failed to consult the Medical Care Advisory Committee ("MCAC") before adopting the fiscal year 1992 rate. The regulation Plaintiffs cite provides:

> *Committee participation.* The committee must have opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program.

42 C.F.R. § 431.12(e).

The Defendants respond that it is necessary to consult with the Medical Care Advisory Committee only when some change in the state's plan, reimbursement methodology or eligibility requirements is contemplated.

Those courts which have interpreted Section 431.12 have found violations only where a state has made such a change. *See, e.g., Turner v. Heckler,* 573 F.Supp. 867 (S.D.Ohio, 1983) (state must consult MCAC before adopting a cap on deductible amounts by Medicaid recipients), *rev'd on other grounds,* 783 F.2d 657 (6th Cir.1986); *Oklahoma Hospital Ass'n v. Oklahoma Department of Human Services,* Case No. CIV–83–1274BT (W.D.Okla., Order of August 24, 1983), *reprinted in* Medicare & Medicaid Guide (CCH, 1983–2 Transfer Binder) Par. 33,057 (hospital demonstrated substantial likelihood of success on MCAC claim where state did not provide an opportunity for MCAC to comment on new hospital rate methodology); *Morabito v. Blum,* 528 F.Supp. 252 (S.D.N.Y.1981) (changes in Medicaid eligibility requirements).

The Plaintiffs interpret Section 431.12(e) as requiring consultation with the Medical Care Advisory Committee where "implementation" issues are involved. Plaintiffs cite *Coalition of Michigan Nursing Homes v. Dempsey,* 537 F.Supp. 451 (E.D.Mich.1982), in which the state of Michigan amended its state plan to reduce the "maximum profit factor" for long term nursing facilities. The state Department of Social Services apparently did not consult the MCAC before adopting the amendment, but did give notice to the MCAC before the effective date of the rate reduction. A coalition of nursing homes sued the Director of the state's Department of Social Services, claiming, inter alia, a violation of the Section 431.12(e) consultation requirement, and seeking a preliminary injunction against the rate reduction. The district court denied the preliminary injunction, reasoning that while consultation with the MCAC would have been better if implemented in the early stages, exigencies such as the state's fiscal deadline, as well as other factors, prevented the conclusion that consultation was so inadequate as to warrant a preliminary injunction.[15] *Coalition of Mich. Nurs. Homes,* 537 F.Supp. at 461, 462.

---

**14.** A copy of the chart is attached to this Order as Appendix A.

**15.** The other factors considered included the fact that the MCAC was apprised that expenditure

reductions would be necessary before the rate reduction was implemented; and the fact that representatives of the nursing home industry

The Court does not interpret Section 431.-12(e) as requiring consultation with the Medical Care Advisory Committee at each stage of the rate-setting process. The Plaintiffs' evidence does not support a finding that the Defendants changed their methodology or their eligibility requirements without consulting the MCAC; rather, Plaintiffs' evidence shows only that the State adopted its final reimbursement rate for fiscal year 1992 without consulting the MCAC. The Plaintiffs' evidence, viewed in the light most favorable to the Defendants, fails to establish a violation of Section 431.12(e).

## VIII. Defendants' Motion to Reconsider Magistrate's Ruling

■ On March 17, 1992, the Magistrate Judge denied Defendants' request for extensive discovery concerning the costs and operations of the six plaintiff nursing homes and of other nursing facilities. The Magistrate Judge rejected the Defendants' argument that such discovery was appropriate as a result of the Plaintiffs' request for interim monetary relief. Defendants have filed a motion asking the Magistrate Judge to reconsider that ruling, and have filed an objection to that ruling.

Defendants cite *Kansas Health Care Ass'n v. Kansas Dep't of Social Services,* 958 F.2d 1018 (10th Cir.1992) for the proposition that in addressing the Plaintiffs' claims of procedural violations of the Boren Amendment, it is necessary to "inquire into the nature of [the] operations of individual providers." Defendants' reliance upon *Kansas Health Care, supra,* is misplaced. In that case, the Tenth Circuit noted that the state of Kansas operated a facility-specific reimbursement system, calculating each facility's reimbursement rate by focusing on its historical costs, and considering where those costs fall in a percentile comparison with costs reported by other providers. When the state imposed a rate freeze, two nursing home associations sued as representatives of the state's nursing facilities, challenging both the substantive adequacy of the rates and the procedure by which the rates were set. The plaintiffs sought a preliminary injunction against implementation of the state's rate freeze

were members of the MCAC, which gave its

amendments. In light of these circumstances, the Tenth Circuit found that participation of the individual nursing facilities would be necessary, and held that the association Plaintiffs lacked standing.

In this case, it will not be necessary for the Court to conduct an inquiry into the operations of and expenses incurred by individual nursing home providers. The State of Oklahoma employs a state-wide reimbursement rate, not a facility specific rate system like the one used in Kansas. Since the Plaintiffs make no claim based on the substantive adequacy of the rate, it will not be necessary for the Court to hear evidence on the adequacy of the rate, either as it impacts the nursing home industry as a whole or with respect to individual facilities.

Moreover, the specific procedural claims raised in this case do not warrant inquiry into the operations of or costs incurred by the six nursing home plaintiffs or other participating nursing homes. The discovery sought is not relevant to the issue of whether the Defendants violated applicable Medicaid regulations requiring the state Plan to specify comprehensively the methods and standards used in the ratemaking process. Nor is it relevant to the Plaintiffs' claim that the Defendants violated Medicaid regulations by failing to consult with the Medical Care Advisory Committee, or to any of the Plaintiffs' other claims which focus solely upon the procedures used in setting rates.

The Plaintiffs' procedural challenge to the state's findings and assurances does not, in this instance, require an inquiry into the operations and expenditures of any nursing facilities because the state's findings and assurances are plainly inadequate. Since the Defendants have not identified any efficiently or economically operated nursing facilities, or the costs which such facilities must incur, the Court need not inquire into the accuracy of the Defendants' findings. Discovery concerning the operations and costs of various nursing facilities is not relevant to this inquiry.

implicit ratification to the rate reductions.

## IX. Relief

Having found that the State's fiscal year 1992 Medicaid reimbursement rate is procedurally invalid, the Court must fashion appropriate relief. The ordinary remedy for procedural violations of the Boren Amendment is for the court to declare the state plan invalid, and to order the state to promulgate a new plan which complies with the Act. *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 520, 110 S.Ct. 2510, 2523 n. 18, 110 L.Ed.2d 455 (1990). Having found that the Defendant state officials violated the Boren Amendment and its implementing regulations in adopting Oklahoma's fiscal year 1992 reimbursement rate, the Court finds such declaratory and injunctive relief to be appropriate in this case.[16]

The Court finds and declares that Oklahoma's fiscal year 1992 Medicaid reimbursement rate for nursing facilities is invalid insofar as it was adopted pursuant to methods and standards which were not specified comprehensively in the State's Plan; and insofar as the Defendants failed to identify efficiently and economically operated nursing facilities, and the costs which such facilities must incur, before adopting the fiscal year 1992 reimbursement rate. The parties are hereby directed to confer with each other in a good faith effort to agree upon a proposal for compliance with applicable provisions of the Boren Amendment and its implementing regulations with respect to the fiscal year 1992 Medicaid reimbursement rate. Because the Court has found a continuing violation of the same provisions of federal law with respect to the adoption of the fiscal year 1993 rate, the parties are further directed to confer in a good faith effort to reach an agreement for compliance with respect to the fiscal year 1993 rate. In the event the parties are unable to submit an agreed proposal within thirty (30) days of the date of this Order, the Defendants are hereby ordered to submit their proposals for compliance within thirty days after that time. The Plaintiffs may submit a response to the Defendants' proposals within fifteen (15) days thereafter. The Court recognizes that, in order to comply with the applicable regulations, it will be necessary for the state to amend its Medicaid Plan so as to specify comprehensively the methods and standards used to set rates.

The Plaintiffs have previously asked the Court to adopt an interim rate for fiscal year 1992 pending compliance by the Defendants with the Court's mandatory injunction. Fiscal year 1992 has now expired and the evidence before the Court at this time shows, at most, that there are a few claims for fiscal year 1992 still outstanding. Moreover, the Plaintiffs have not offered sufficient evidence to support a finding that the fiscal year 1992 rate of $46.40 per day is substantively inadequate; Plaintiffs do not even challenge the substantive adequacy of the rate. The Court therefore deems it inappropriate to impose an interim rate for fiscal year 1992 at this time. The Court notes that the Plaintiffs have not requested that the Court adopt an interim reimbursement rate for fiscal year 1993, although the Plaintiffs have demonstrated that a continuing violation exists with respect to the fiscal year 1993 rate. In order to remedy the continuing violation of the Medicaid statutes and regulations, it will, of course, be necessary for Defendant state officials to adopt a procedurally valid rate for fiscal year 1993 as well. Prompt compliance by the Defendants with the Court's directives will mitigate the need for court ordered interim relief with respect to the fiscal year 1993 rate. The Court at this time defers any ruling upon the propriety of interim relief for fiscal year 1993.

## X. Defendants' Motion to Strike

Defendants have moved the Court to strike the February 10, 1992 affidavit of Bruce Thevenot on the ground that it incorporates the results of a computerized costs study conducted by the Plaintiff nursing home association, Defendants contend they have not had an opportunity to conduct discovery concerning the cost study, and thus have not had a fair opportunity to respond to the affidavit. It seems clear that the Affidavit was submit-

---

**16.** It is not necessary for the Court to further conclude that the State's reimbursement rate for fiscal year 1992 is substantively inadequate. *See Temple University—of the Commonwealth System* *of Higher Education v. White,* 729 F.Supp. 1093 (E.D.Pa.1990), *aff'd,* 941 F.2d 201 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1991).

ted in response to the Defendants' argument that its 1992 rates were overly generous. Moreover, the Court has not considered the cost study in reaching its decision with respect to the Plaintiffs' claims of procedural violation of the Boren Amendment. In reaching the conclusions detailed in this Order, i.e., that the Methods and Standards are inadequate, and that the findings and assurances are inadequate, the Court has not found it necessary to consider the cost of operating a nursing home. Defendants' Motion to strike is, therefore, denied as moot.

### Conclusion

Defendants' second Motion to Dismiss is hereby DENIED. Plaintiffs' Motion for Summary Judgment is hereby GRANTED with respect to the Plaintiffs' claims that the State's fiscal year 1992 reimbursement rate was adopted pursuant to methods and standards which are not specified comprehensively in the State's Plan; and with respect to the Plaintiffs' claim that the fiscal year 1992 reimbursement rate for fiscal year 1992 is not supported by adequate findings and assurances as set forth above. Plaintiffs' Motion for Summary Judgment is DENIED in all other respects. Defendants' Motion to Strike is hereby DENIED. Defendants' Motion to Reconsider is hereby DENIED, and Defendants' Objection to the Magistrate's ruling on discovery is OVERRULED.

IT IS SO ORDERED.

### APPENDIX
#### OKLAHOMA DEPARTMENT OF HUMAN SERVICES

Proposed Rate Increases
for Fiscal 1992

| Service | Current Rate | Proposed Rate | Amount of Increase | State Cost Orig. Request | Legislative Appropriation | Increased Rate Based on Appropriation | New Rate |
|---|---|---|---|---|---|---|---|
| Nurs. Facility | $43.90 * p.p.d. | $47.40 p.p.d. | $3.50 p.p.d. | $4,755,858 | $2,966,676 | $2.50 | $46.40 |
| Home Maint. Aides | 8.66/2 hrs. | 10.00/2 hrs. | 1.34/2 hrs. | 572,181 | 250,000 | 0.59 | 9.25 |
| Non–Tech. Med. Care | 14.00/3 hrs. | 16.50/3 hrs. | 2.50/3 hrs. | 1,947,864 | 572,181 | 1.00 | 15.00 |
| Total | | | | $7,275,903 | $3,788,857 | | |

* Does not include minimum wage approved for March 1 to June 30, 1991. p.p.d.—Paid per day